MASHPEE TRIBE, Plaintiff, Appellant,

v.

NEW SEABURY CORP. et al.,
Defendants, Appellees.

MASHPEE TRIBE, Plaintiff, Appellee,

v.

NEW SEABURY CORP. et al.,
Defendants, Appellants.

MASHPEE TRIBE, Plaintiff, Appellee,

v.

NEW SEABURY CORP. et al.,
Defendants, Appellees,

Matthew B. Connolly, etc., Defendant,
Appellant.

Nos. 78–1272 to 78–1274.

United States Court of Appeals,
First Circuit.

Argued Nov. 8, 1978.

Decided Feb. 13, 1979.

576

James D. St. Clair and Allan van Gestel, Boston, Mass., with whom Stephen H. Oleskey, William F. Lee, Hale & Dorr, James J. Dillon, Goodwin, Procter & Hoar, Morris Kirsner, Edwin J. Carr, May, Bilodeau, Dondis & Landergan, Thomas B. Shea, Andrew J. McElaney, Jr., Asst. Atty. Gen., Thomas Otis, Boston, Mass., Selma R. Rollins and Rollins, Rollins & Fox, Chestnut Hill, Mass., were on brief, for New Seabury Corp. et al.

Richard B. Collins, Window Rock, Ariz., with whom Thomas N. Tureen, Portland, Me., Moshe J. Genauer and Barry A. Margolin, Boston, Mass., were on brief, for Mashpee tribe.

Joseph E. Brennan, Atty. Gen., John M. R. Paterson, Deputy Atty. Gen., and David Roseman, Asst. Atty. Gen., Augusta, Me., on brief, for the State of Me., amicus curiae.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges. ·

COFFIN, Chief Judge.

Plaintiff, denominating itself the Mashpee Tribe, claims to be a tribe of Indians that has lived in and around the town of Mashpee, Massachusetts, continuously since time immemorial. The suit is based on the Indian Nonintercourse Act which was first passed in 1790 and exists now as 25 U.S.C. § 177:

> "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. . . ."

Plaintiff claims that its tribal land was taken from it between 1834 and 1870 without the required federal consent. This suit, filed August 26, 1976, against a defendant class representing landowners in the town of Mashpee, seeks recovery of those lands.

Defendants answered the complaint, in part, by denying that plaintiff is or was a tribe. It is undisputed that if plaintiff was not a tribe in 1976 it lacked standing to bring this suit and that if not a tribe at the critical times in the nineteenth century it was not protected by the Act. The district court severed the issue of plaintiff's tribal status for a separate, preliminary trial. Before trial plaintiff moved for a continuance pending the Department of the Interior's determination whether or not to declare plaintiff a federally recognized tribe. The court denied the motion, and trial began October 17, 1977. The trial lasted 40 days and was submitted to the jury on special interrogatories January 4, 1978. The jury returned its verdict on January 6. The interrogatories, together with the jury's answers, were as follows:

"1. Did the proprietors of Mashpee, together with their spouses and children, constitute an Indian tribe on any of the following dates:

a. July 22, 1790: The date of the enactment of the first version of the federal Nonintercourse Act?

*No*

b. March 31, 1834: The date on which the District of Marshpee was established. [sic]

*Yes*

c. March 3, 1842: The date on which formal partition of land in the District of Marshpee among the proprietors of Marshpee and their children was authorized by act of the legislature of the Commonwealth of Massachusetts?

*Yes*

d. June 23, 1869: The date on which all restraints on alienation of land held individually by Indians and people of color known as Indians were removed by act of the legislature of the Commonwealth of Massachusetts?

*No*

e. May 28, 1870: The date on which the Town of Mashpee was incorporated by act of legislature of the Commonwealth of Massachusetts: [sic]

*No*

2. Did the plaintiff group, as identified by the plaintiff's witnesses, constitute an Indian tribe as of August 26, 1976: The date of the commencement of this law suit?

*No*

3. If you find that people living in Mashpee constituted an Indian tribe or

nation on any of the dates prior to August 26, 1976 listed in Special Question No. 1, did they continuously exist as such a tribe or nation from such date or dates up to and including August 26, 1976?

*No"*

*Mashpee Tribe v. Town of Mashpee,* 447 F.Supp. 940, 943 (D.Mass.1978).

After receiving these answers, but without discharging the jury, the court requested memoranda from the parties to show cause why an order of dismissal should not be entered on the basis of the jury's answers. Plaintiff argued that the special verdicts were inconsistent and ambiguous and moved that, therefore, a new trial should be ordered. The court denied the motion and dismissed the case. Plaintiff asserts in appeal No. 78–1272 as error the court's denial of the pre-trial motion for a continuance, certain aspects of the court's instruction on the definition of "tribe", the court's instructions concerning allocation of the burden of proof, the court's ruling that the special verdicts were not fatally inconsistent or ambiguous, and the court's handling of an ex parte communication with a juror. These issues will be taken up in turn, and we will present the necessary factual background as needed. A fuller discussion of the relevant history may be found in *Mashpee Tribe, supra,* 447 F.Supp. at 943–47. We will not attempt to duplicate the district court's effort.

## I.

Plaintiff argues that the district court erred by refusing to grant a continuance pending Department of the Interior action on Mashpee's application for federal recognition as a tribe. Plaintiff moved for a continuance upon learning that the Department, in a departure from previous policy, had issued proposed regulations for determining whether to recognize tribes and that, using these regulations, the Department would begin proceedings concerning the Mashpees. The court denied the motion but invited the Department to participate in the trial either as an intervenor or as an amicus curiae with permission to submit questions for the court to ask witnesses. The Department chose not to participate in either capacity in part because the Department had not yet taken "a definitive position on the regulations" and, thus, would "not be able to participate meaningfully in the trial of this case at this time."

We hold that the court acted correctly in denying the continuance. The cases cited by plaintiff demonstrate that this is not the kind of case in which the Supreme Court has required courts to defer to administrative process. The deference doctrine [1] primarily serves as a means of coordinating administrative and judicial machinery. *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 68, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); *United States v. Western Pacific R. R. Co.,* 352 U.S. 59, 62, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Far East Conference v. United States,* 342 U.S. 570, 575, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Locust Cartage Co., Inc. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 339 (1st Cir. 1970). It is meant to promote uniformity and take advantage of agencies' special expertise. *Western Pacific R. R. Co., supra,* 352 U.S. at 64, 77 S.Ct. 161; *Far East Conference, supra,* 342 U.S. at 574–75, 72 S.Ct. 492. In a recent pair of antitrust cases against a commodities exchange regulated by the Commodities Exchange Commission, the Court looked at three factors to determine whether a court should defer: (1) whether the agency determination lay at the heart of the task assigned the agency by Congress; (2) whether agency expertise was required

---

1. The doctrine has occasionally been referred to under the label "primary jurisdiction", *see, e.g., Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 68, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970), but the Court has not used the label in all its administrative deference cases. The problem, strictly speaking, is not one of jurisdiction. Indeed it comes into play only when both the court and the agency have jurisdiction over at least portions of the dispute. Rather the problem is one of harmony, efficiency, and prudence.

to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court. *Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 114–15, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Other cases have identified other reasons for deferring to administrative agencies. Deference can dam a potential flood of suits seeking de novo review of agency determinations. *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 653, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973) (fearing suits testing the status of each newly developed "me-too" drug). Deference can permit an agency to follow through and supervise earlier actions. *Port of Boston, supra,* 400 U.S. at 68, 91 S.Ct. 203 (agency had approved the agreement under dispute). The doctrine recognizes that some problems are better solved by the more flexible procedures possible before agencies not bound by Article III limitations. *Id.* And, finally, agencies often have prescribed procedures specially designed to resolve particular kinds of disputes. *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 339, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Western Pacific R. R. Co., supra,* 352 U.S. at 64, 77 S.Ct. 161.[2]

The Department of the Interior has not historically spent much effort deciding whether particular groups of people are Indian tribes. By and large no one has disputed the tribal status of Indians with whom the Department has dealt. The Department has never formally passed on the tribal status of the Mashpees or, so far as the record shows, any other group whose status was disputed. Therefore, the Department does not yet have prescribed procedures and has not been called on to develop special expertise in distinguishing tribes from other groups of Indians. Moreover, the facts in this case, though developed and interpreted in part with the expert help of

historians and anthropologists, are not so technical as to be beyond the understanding of judges or juries. As the court said in its charge, "We are dealing with the human condition here as well." Finally, ours is a straightforward Article III case. The resolution will not affect rights of others than the parties except in the traditional legal effect that our opinion will have as precedent. The facts on which the dispute turns, though hard to come by, are adjudicative facts. They are not in the nature of legislative policy decisions. For all these reasons, we cannot be sure how helpful the Department's ultimate decision might be. We can, however, be certain that the decision will not be available soon. The court was right to respect the "strong public interest in the prompt resolution" of the case and not defer to administrative action of uncertain aid and uncertain speed. It follows from what we have said, of course, that in another case, once the Department has finally approved its regulations and developed special expertise through applying them, we might arrive at a different answer.

## II.

The next challenge is to the court's instructions on the definition of "tribe". Plaintiff must prove that it meets the definition of "tribe of Indians" as that phrase is used in the Nonintercourse Act both in order to establish any right to recovery and to establish standing to bring this suit. This issue is particularly difficult in this case because the Mashpees differ from most other groups who have sought to assert rights as Indian tribes. The federal government has never officially recognized the Mashpees as a tribe or actively supported or watched over them. Moreover, the Mashpees have a long history of intermarriage with non-Indians and acceptance of non-Indian religion and culture. These facts do not necessarily mean that the Mashpees are not a tribe protected by fed-

---

**2.** Though the Court has suggested that " '[i]t is a doctrine allocating the law-making power over certain aspects' of commercial relations", *United States v. Western Pacific R. R. Co.,* 352 U.S. 59, 65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), it has been applied somewhat more broadly. *See Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963) (management of public lands). Nor is a plaintiff barred from invoking the doctrine. *Id.*

eral law,[3] but they do make the issue of tribal existence a difficult factual question for the jury.

■ Because most groups of Indians involved in litigation in the federal courts have been federally recognized Indians on western reservations, the courts have been able to accept tribal status as a given on the basis of the doctrine going back at least to *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 756–57, 18 L.Ed. 667 (1867), that the courts will accord substantial weight to federal recognition of a tribe. *See, e.g., Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir. 1975). One consequence is that very little case law has developed on the meaning of "tribe". The court below, in its instructions to the jury, relied primarily on *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901):

> "By a 'tribe' we understand a body of Indians of the same or similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory . . . ."[4]

Neither party challenges this basic definition, but it is far from satisfactory. Its four elements—(a) "same or similar race"; (b) "united in a community"; (c) "under one leadership or government"; and (d) "inhab-

iting a particular . . . territory"— leave much to be explained. A few other cases have described characteristics of tribes whose status as such was in question. *See United States v. Candelaria*, 271 U.S. 432, 442–43, 46 S.Ct. 561, 70 L.Ed. 1023 (1926); *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 756, 18 L.Ed. 667 (1867); *United States v. Wright*, 53 F.2d 300 (4th Cir. 1931). But these tribes bore little resemblance to the Mashpees.

Starting with the *Montoya* definition, the district court went on to explain each of its elements at some length. Plaintiff asserts as error the court's explanation of two of the elements of the definition: (1) the requirement of a "leadership or government" and (2) the requirement that the Indians be "united in a community".

Beginning with the requirement of leadership, we will reprint the several pertinent sections of the charge rather than attempt to summarize the court's explanation.

> "There has to be a leadership or government. . . . Obviously, this was a little enclave in one corner of Massachusetts. It could not have a government like that in Massachusetts; it could not compete with the government of Massachusetts. Clearly, there was an area in which it could exercise control over its own internal relations, to control the relationship . . . among its own mem-

---

3. As we said in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir. 1975), "Congress is not prevented from legislating as to tribes generally; and this appears to be what it has done in successive versions of the Nonintercourse Act. There is nothing in the Act to suggest that 'tribe' is to be read to exclude a bona fide tribe not otherwise federally recognized." On the other hand, though the scope of congressional power to deal with the Indians is very broad, it is not unlimited. Congress cannot deal with Indians solely as a racial group. *United States v. Antelope*, 430 U.S. 641, 645, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977). Nor can Congress arbitrarily label a group of people a tribe. *United States v. Candelaria*, 271 U.S. 432, 439, 46 S.Ct. 561, 70 L.Ed. 1023 (1926); *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 58 L.Ed. 107 (1913). A tribe must be something more than a private, voluntary organization. *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975).

4. Though *Montoya* did not involve the Nonintercourse Act, this definition was later used in *United States v. Candelaria*, 271 U.S. 432, 443, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), which did involve the Nonintercourse Act. The scope of the phrase "Indian tribe" may vary from statute to statute, *see United States v. Sandoval*, 231 U.S. 28, 48–49, 34 S.Ct. 1, 58 L.Ed. 107 (1913), but it is important to bear in mind that generally legislation conferring benefits or protection on Indians is to be construed liberally in their favor. *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649, 660 (D.Me.1975), *aff'd*, 528 F.2d 370 (1st Cir. 1975), and cases cited. The policies of the Act in question may be used to aid in interpreting the Act, *Joint Tribal Council, supra*, 528 F.2d at 377, but if Congress chooses to give Indian tribes a far-reaching remedy that choice should not be frustrated by judicial decree.

bers . . ., between the management and the others and among all of the members of the group."

* * * * * *

"The level of leadership or government that was appropriate for this situation also has to be considered in terms of the need. How much government do you need? You've got three or four hundred people on 13,000 acres of land, and their interaction may not have been so intense as to require constant regulation. Bear in mind these . . . three and four hundred people . . . were grouped in families, in family households, and it may well be they were spread kind of thin. How much government is required? Well, that is for you to decide."

* * * * * *

"There were a series of petitions in the 1740's–1760's, leading to the formation of the district. After 1788 some more petitions complaining about the grieved position under the guardians. It may be a reasonable inference from those events that there was a continuing political leadership, but you must be prepared to make that inference, and that is solely for you to determine because sporadic grouping, sporadic leadership is not what is meant by 'united in a community under one leadership or government.'

You can have that any time in a fire or flood in the neighborhood where some people will emerge and organize a rescue or organize boats or a bucket brigade, whatever is needed. That is not the kind of leadership we are talking about. We are talking about something that goes on, has continuity. Continuity of leadership in which leadership is passed on in some orderly way."

* * * * * *

"[T]he notion of sovereignty . . . is not an element, a necessary element of tribal existence. What it is is a leadership which has evolved in some respect . . . which has its roots and has evolved from a once sovereign Indian community. Now, it may take different forms."

* * * * * *

"Clearly, whatever kind of leadership or government the tribe has, if it is a tribe, it cannot compete with the duly established government of the Commonwealth. You would not expect, under these circumstances, and it would not be legally permissible for a group within a town to have its own courts, in any formal sense. It could conceivably set up a school system if it were sufficiently wealthy, . . . but that . . . should be considered in the context of a school system, which until recently, was predominantly Indian, anyway, according to the testimony."

* * * * * *

"The testimony most favorable to the plaintiff has been that these leaders, as identified by various witnesses, are leaders with respect to a way of life. . . . [Y]ou can consider all of that testimony, whether there is enough in your opinion to warrant the inference that there was controlling leadership of significant elements in the lives of the people. Significant elements. For the leadership to be such as qualifies the group as a tribe, there must be followers."

* * * * * *

"There was a core group that was very much concerned about Indian affairs, a good many of them have shown up in the courtroom, some have not.

Now, the existence of 30, 40, 50, 60 people, who are concerned with the existence of a chief, who pay attention to what the chief is doing, expect various things from the chief of the tribe or the leaders of the tribe, or the leaders of the group, rather, is not enough. You've got to find that the leadership, whatever it is, has a significant effect upon at least a majority of the claimed group."

* * * * * *

"There will be a diminution of influence from the center of the organization to the fringe . . . [T]here are some people who are reasonably enthusiastic and attend all the time, and out at the fringe

there are some people that don't show up but once a year and not every year at that. That is a common characteristic of all organizations. We are dealing with the human condition here, as well. I suppose, if you found that to be the situation, it would not mean that there was no tribe. But you do have to find that it is something more than just a small coterie, a small band of enthusiasts who are supporting the Indian leadership, if that is what it is, in Mashpee.

. . . Obviously, more enthusiasm should be e[xp]ected of those within the town than those that are without. . . . Well, . . . it's up to you to decide whether you've got a leadership that is governing the conduct, the lives of the people in some significant way, that people order their lives in response to these leaders' requirements in some significant way. . . ."

\* \* \* \* \* \*

"This is nothing more essentially political than speaking on a town meeting floor or lobbying the Governor of the state, no matter for what purpose. . . . [B]ut the question is, is it significant? Is it evidence of a continuing leadership? That goes back to what I said about the petitions that were filed in the eighteenth century."

\* \* \* \* \* \*

"Now, that is for you to decide, under all the circumstances, whether that leadership is tribal leadership, whether it's the leadership which would be followed, adopted and obeyed in some significant degree by at least a majority of the people who are going to be a tribe in 1976."

■ Plaintiff complains that the court erroneously required it to prove "binding authority" over the group's members and an orderly means of transmitting the leadership. The first complaint is not true as a matter of fact. The court never said that a tribe's leaders' influence must be "binding" but that they must cause the people to "order their lives . . . in some significant way". The people must "follow[ ], adopt[ ] and obey[ ]" the leadership. And

the leadership must be "controlling . . of significant elements in the lives of the people." But the court's discussion demonstrates that it did not require plaintiffs to show "coercive power or binding authority" or to "exhibit the full panoply of governmental powers exercised by advanced groups . . . ." The court was trying to establish a fair test to determine whether the alleged tribal leadership had any followers. If no one follows, then the would-be leader is not leading anyone and cannot sustain the claim to leadership.

The court explicitly charged that plaintiff did not have to show any kind of sovereignty or an ability to compete with the Commonwealth of Massachusetts for power over the Mashpees. The court pointed out that plaintiff need not have a court system, a school system, or any other formal governmental institutions. Further, the court instructed the jury to consider the claims that the asserted leaders "are leaders with respect to a way of life". Such leadership is certainly not expected to be coercive or binding. Plaintiff was allowed to show leadership, at least in part, by demonstrating that the alleged leaders were role-models to whom a majority of the asserted tribe responded on questions of tribal or ethnic significance. In the same vein the court, in its discussion of diminution of influence towards the fringe of an organization, permitted the jury to consider as followers those who responded to the leaders with less than total enthusiasm. Absolute obedience, voluntary or coerced, was explicitly not a prerequisite to tribal existence. Furthermore, the examples of political activity that the court allowed the jury to consider in deciding whether the requisite leadership or government existed were not examples of coercive power over constituents, but of representation of constituents' interests before non-Indian governmental bodies. One need have no coercive power to speak at town meetings, submit petitions, or lobby a governor. The court required plaintiff to show only such leadership or government as its situation required. The court pointed to some legitimate evidence. Plaintiff's prob-

lem was that it did not submit sufficient evidence to convince the jury that the asserted leaders had enough followers on significant issues.

Turning to the issue of continuity of leadership, it is true that the court at one point required that leadership be "passed on in some orderly way". Read in the context of the entire instruction, however, it is clear that the court was not imposing a requirement of formal systems of succession. The court never required elections, inheritance, or any other fixed system of determining a leader's successor. The court's concern was not with how the leadership passed, but with making sure that the leadership did pass. The sentence on which plaintiffs seize was a way of differentiating the necessary leadership from sporadic, crisis-oriented leadership that would disappear as soon as the crisis was resolved. We agree that a fire or a flood cannot spawn a "tribe" that exists only during the disaster.

Accordingly, the court instructed that there must be a continuous leadership. It suggested as evidence worth considering, the series of petitions filed on behalf of the Mashpees beginning in the middle of the eighteenth century. The court permitted the inference that those petitions might be evidence of a continuing political leadership. We interpret the court's instruction to require that there be a recognized leadership to which the people can turn at any time—a leadership "orderly" in the sense that, whether or not there is a specific short-term crisis, the need for ongoing leadership is always met without a significant break in continuity. Nothing the court said contradicted plaintiff's position that a tribe ought to be able to choose its leaders in any way it sees fit and for whatever purposes are necessary. *Montoya* held that a group without leaders or government could not be a tribe. The district court's instructions are consistent with and, probably, more favorable to plaintiff than the every day usage of the terms in the *Montoya* definition would be. Without the court's interpretation the jurors might well have construed the phrase "leadership or government" to imply the formal kinds of structures and institutions by which the jurors themselves are governed.

Not only did the portions of the court's instructions complained of not mean what plaintiff suggests, but the court read to the jury the very language that plaintiff argues is a more correct statement of law. That passage, also from *Montoya,* explained why, according to the Supreme Court, Indian tribes were not nations.

"As they had no established laws, no recognized method of choosing their sovereigns by inheritance or election, no officers with defined powers, their governments in their original state were nothing more than a temporary submission to an intellectual or physical superior, who in some cases ruled with absolute authority, and in others, was recognized only so long as he was able to dominate the tribe by the qualities which originally enabled him to secure their leadership. In short, the word 'nation' as applied to the uncivilized Indians is so much of a misnomer as to be little more than a compliment." 180 U.S. at 265, 21 S.Ct. at 359.

Though not "nations" in the eyes of turn-of-the-century civilization, the groups so described were tribes. The discussion in *Montoya* of "nation" supplements that Court's definition of "tribe". Different sections of an opinion should be read as consistent with each other. Moreover, the district court's definition of "tribe" is consistent with the passage cited above. Therefore, plaintiff's challenge to this aspect of the instruction must fail.

Plaintiff interprets the court's instruction relative to the "united in a community" requirement to permit the jury to find there is no tribe if the Indians have become assimilated into the general society. Its concern is that the jury could find that the tribe ceased to exist through assimilation without having voluntarily decided to abandon tribal existence. Such a finding, it asserts, would be contrary to established law. Again, we will reprint the relevant portions of the court's instruction before discussing plaintiff's position.

"There has to be a community. 'United in a community,' the Court said. I suggest to you an Indian community is something different from a community of Indians. That is to say, it has some boundary that separates it from the surrounding society, which is perceived as Indian and not merely as neighborhood or territory." [5]

\* \* \* \* \* \*

"It would be permissible to find that the boundary was in part established by the outside, that is, that there was a social boundary established in part by discrimination of the white inhabitants against the Indians."

\* \* \* \* \* \*

"Now the question for you to decide is whether in accepting this property [the proprietorship], accepting these rights with their limitations, the Indians intended to give up their tribal organization and assume an English organization, or whether it was simply the tribal organization carrying on as owners of this plantation with a different label."

\* \* \* \* \* \*

"The question comes when English forms are adopted. English labels are adopted, whether that has constituted an abandonment of the tribal form in a complete submission and adoption of an English form instead. Abandonment being the key word. Abandonment of a right or status does not occur unless it is voluntary, unless it is a knowing and willing and voluntary act. Abandonment cannot be found because of conditions which have been imposed from the outside."

\* \* \* \* \* \*

"Again [looking at 1976], we have the question of community and whether that community is defined by characteristics which are identifiable as Indian, not necessarily aboriginal Indian."

\* \* \* \* \* \*

"It is, I suppose, possible that by reason of circumstances, tribal existence be so suppressed that it be in limbo for a period, that it not be manifest for a period without there being an abandonment. If you find that there was, by reason of the activities in 1869, 1870, a conscious abandonment of tribal status, then you would not be warranted in finding the existence of a tribe in 1976."

\* \* \* \* \* \*

"Now, there is one other aspect that I would like to address, and that is the subject of assimilation. In one of the cases it is said that the Nonintercourse Act, really, refers to poor and uninformed people as opposed to assimilated and sophisticated. . . . And by saying a group is assimilated is the reverse of the coin of saying they have a distinct Indian community, and so I suggest that you not be concerned about that except in that context.

If you find that the group is assimilated, well, it doesn't have a distinct community, it's just blended in with everybody else, in all respects or in all significant respects. So assimilation is simply a way of expressing the reverse of the existence of an Indian community."

We agree that if a group of Indians has a set of legal rights by virtue of its status as a tribe, then it ought not to lose those rights absent a voluntary decision made by the tribe and by its guardian, Congress, on its behalf.[6] *The Kansas Indians*, 72 U.S. (5

---

5. The word "boundary" was used during the trial as an anthropological concept. A boundary in this sense is not something tangible or territorial like a fence or a border. Rather, it is an attitude or consciousness of difference from others, a sense of distinction between "we" and "they".

6. In *Passamaquoddy, supra*, we held that the Nonintercourse Act established a trust relationship between Congress and the Indian tribes,

528 F.2d at 379, and that "Congress alone has the right to determine when its guardianship shall cease. . . . Neither the . . . Tribe nor the State . . . ., separately or together, would have the right to make that decision and so terminate the federal government's responsibilities." *Id.* at 380 (citations and footnote omitted). The establishment of a trust relationship with tribes generally, however, did not guarantee the perpetual existence of any

Wall.) 737, 757, 18 L.Ed. 667 (1867); *The Confederated Salish and Kootenai Tribes v. Moe*, 392 F.Supp. 1297, 1315 (D.Mont.1975) (supplemental order of three-judge court), *aff'd sub nom. Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed. 96 (1976). A tribe, even if it is federally recognized, however, can choose to terminate tribal existence. *See The Kansas Indians, supra*, 72 U.S. at 759 (a state's policy of treating Indians the same as other citizens could "eventually succeed in disbanding the tribe," but presumably only to the extent the tribe chose to acquiesce in that policy); *United States v. Joseph*, 94 U.S. 614, 617, 24 L.Ed. 295 (1876), *overruled as to result but not necessarily logic, United States v. Sandoval*, 231 U.S. 28, 48, 34 S.Ct. 1, 158 L.Ed. 107 (1913). Certainly individual Indians or portions of tribes may choose to give up tribal status. *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) (holding that that portion of tribe which chose to stay behind when tribe moved dissolved relations with tribe and lost interest in tribal claims); *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 171, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *United States v. Wright*, 53 F.2d 300 (4th Cir. 1931) (holding that portion of tribe that chose to stay behind when tribe moved lost tribal status though gradually restored to that status by federal recognition and protection). If all or nearly all members of a tribe chose to abandon the tribe, then, it follows, the tribe would disappear.

The court instructed the jury that any abandonment of tribal status must be "knowing and willing and voluntary".[7] Once the jury found that a tribe existed in 1834 and 1842, that tribe could not cease to exist absent a voluntary decision.[8] The instructions barred the jury from deciding that the tribe went out of existence through some involuntary process of assimilation. The court instructed that involuntary imposition of conditions could not constitute an abandonment. The Indians had to "intend[ ] to give up their tribal organization" and abandon their tribal rights and status voluntarily. The jury obviously found that the tribe had made such a decision. It was open to the jury to decide whether the tribe had decided to give up being a distinct community and instead to merge with the rest of society in all significant respects. We cannot know whether the jury based its verdict on a finding of voluntary assimilation, but such a decision would not go contrary to law.

■■■■ We conclude that though a few isolated sentences of the charge may have been unclear or overstated, the instructions taken as a whole were largely consistent with the position plaintiff argued before us. Therefore, we will not reverse on the basis of the court's instructions. This holding is a narrow one, and it may be useful to point out what we do not hold. We have no occasion to pass on portions of the court's instruction other than those discussed above. Even as to those portions we have considered, the issue we have decided, technically, is not whether those portions are correct as a matter of law, but whether they conform to the objecting party's view of the law. Finding they do, we see no

particular tribe. Plaintiff here must still prove that it was a tribe at the relevant times before it can claim the benefit of a trust relationship.

7. This standard for abandonment is sufficiently favorable to the plaintiff. Choosing not to continue as a tribe raises issues very different from those raised when one claimant to property asserts that another abandoned the property. We can think of no reason to import the property law rules concerning abandonment into our context simply because the same word has been used.

8. We reject defendants' argument that the court did not indicate that tribal existence could terminate through social or cultural assimilation. The court instructed that if the group were sufficiently assimilated then it could not be a tribe. Since the plaintiff was required to prove its tribal status at each relevant date, if the jury found the group was a tribe at one date, but later had voluntarily become assimilated—had ceased to exist as a separate and distinct community—then the jury would have to find they were no longer a tribe.

remaining controversy. Because there are no sure yardsticks against which to measure the court's instructions, we cannot say that even those we considered are correct or the best possible, but we have not found any law conflicting with the portions of the charge we have reviewed.

The court did a good job with a very difficult task. Its explanation related the elements of the broad legal definition, developed when Indian tribes' relationship to the United States was very different, to the particular history of this group and to the modern position of Indians in our society. We think it appropriate that the definition of "tribe" remain broad enough and flexible enough to continue to reflect the inevitable changes in the meaning and importance of tribal relations for the tribal members and the wide variations among tribal groups living in different parts of the country under different conditions. That the Mashpees have lost this case represents not a failure of the law to protect Indians in changing times, but a failure of the evidence to show that this group was an object of the protective laws. In future cases, if the issue of tribal status is raised, the court, with the aid of the parties and expert witnesses, will be able to shape instructions responsive to the special problems presented at that time. For these reasons, we think it preferable not to adopt, word-for-word, the

court's instructions as the "true" definition of "tribe". Unlike, for instance, explanations of "reasonable doubt", no one explanation of the *Montoya* definition can adequately serve in all cases at all times.

### III.

Plaintiff next objects to the trial court's allocation of the burden of proof. The court instructed the jury that the plaintiff carried the burden of proof on every issue and that the defendant had no burden. "What this means is that if you are left in doubt as to a particular issue that is material, you must find for the defendant . . . ." Appellant contends that once it showed it was a tribe, the burden should have shifted to appellee to prove that plaintiff voluntarily gave up tribal status.[9]

 Appellant's first argument, and the only one clearly presented to the trial court,[10] is that 25 U.S.C. § 194 requires the burden to shift. That section provides:

"In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership."

9. The court did ease the plaintiff's task somewhat by instructing the jury that it could "infer that . . . conditions . . . tend to continue and change if they do change, gradually." Though the specific purpose of this instruction was to permit the jury to use evidence relating to general periods of time in deciding whether plaintiff was a tribe on the specific dates mentioned in the special verdicts, it permitted the jury to consider whether the defendants had presented evidence to show that conditions, once established, changed. The jury might have chosen, in effect, to shift the burden to defendants.

10. Though defendants did not argue the point, it is questionable whether plaintiff preserved the burden of proof issue for appeal except as a matter of statutory law. Both the request for instructions and the objection to the instructions specifically referred to 25 U.S.C. § 194 as the grounds for plaintiff's version of the law. The Federal Rules of Civil Procedure, Rule 51,

specifically require a party not only to object to an instruction, but to state the grounds for objection. A party cannot reserve grounds for objection in order to deprive the trial court of the opportunity to correct the instruction, thereby creating an appealable issue. "As a general rule, where a party fails to object to an instruction, we will not consider that objection upon appeal. *Stafford v. Perini Corp.*, 475 F.2d 507, 511 (1st Cir. 1973)." *Johnston v. Holiday Inns, Inc.*, 565 F.2d 790, 797 (1st Cir. 1977). The same rule can apply to limit parties to those grounds for objection preserved below. See *Sadowski v. Bombardier Ltd.*, 539 F.2d 615, 624 (7th Cir. 1976); *Falkerson v. The New York, New Haven & Hartford RR.*, 188 F.2d 892, 896 (2d Cir. 1951). We discuss other arguments below because defendants do not raise the issue and because we consider the substantive issue important enough to err, if we err, in favor of deciding the merits.

Whatever the applicability of § 194 might have been in a later stage of this case,[11] it was not of any relevance at this stage. There can be no presumption of title in plaintiff until plaintiff has proved it is an Indian tribe and was a tribe at each relevant date. As to these threshold questions, § 194 cannot aid the plaintiff.

In the alternative, plaintiff relies on general evidentiary principles for the same proposition.[12] Plaintiff, having established tribal status in 1834 and 1842, could not cease to be a tribe involuntarily. Therefore, plaintiff suggests, the defendants should have been required to prove that the termination of the tribe was voluntary. This argument is appealing. One of the few principles available to guide us is that normally the party asserting the affirmative of a proposition should bear the burden of proving that proposition. 9 Wigmore on Evidence § 2486, at 274 (3d ed. 1940). *See Pacific Portland Cement Co. v. Food Machinery & Chemical Corp.*, 178 F.2d 541, 547 (9th Cir. 1949); *Reliance Life Ins. Co. v. Burgess*, 112 F.2d 235, 237–38 (8th Cir.), *cert. denied*, 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453 (1949). Here defendants, by way of rebutting plaintiff's claim to be a tribe, argued that, assuming plaintiff was a tribe at some point, the tribe voluntarily gave up its separate status. If the jury did not find that the termination was voluntary, then it would have found the tribe still existed pursuant to the court's instruction that an abandonment must be knowing and willing and voluntary.

As Professor Wigmore noted, however, the affirmative allegation rule is not invariable.[13] In this case, plaintiff could not avail itself of the Nonintercourse Act until it established that it either had always been or became and continued to be a tribe of Indians. Defendants denied plaintiff had ever been or continued to be a tribe. Defendants' case relied in part on evidence that the residents of Mashpee were not essentially different from other residents of Massachusetts, that they were assimilated into the general society and had abandoned tribal life. Consistent with the court's charge, plaintiff had an opportunity to rebut such evidence by introducing evidence showing that any abandonment was the involuntary product of outside coercion. The jury evidently found a change in status that was not involuntary, and, therefore, plaintiff stopped being a tribe.

So characterized, the voluntariness issue is part of the plaintiff's case. We think it fair that plaintiff bore the risk of nonpersuasion. If the jury found that plaintiff became assimilated between 1842 and 1869, and if there were insufficient evidence either way or equally balanced evidence both ways as to whether or not the abandonment was voluntary, plaintiff would have failed to prove it was a tribe at a relevant time.[14] Moreover, plaintiff had an advantage because evidence of coercion from outside the community a century ago is more likely to be available today than is evidence of the state of mind of the individuals who changed their lifestyles. That is, historical records would reveal forced migrations, governmental dealings, urban encroachments, the presence of outsiders, or other arguably coercive forces more readily than

11. We need not decide whether an Indian tribe, as opposed to an individual Indian, may take advantage of the statute. Nor need we determine how to construe "white person".

12. We have already rejected application of the specific law of abandonment, *supra*, note 7, and as plaintiff recognizes, merely labelling abandonment an affirmative defense does not advance the argument.

13. 9 Wigmore on Evidence § 2486, p. 274 (3d ed. 1940). Even Professor Wigmore was forced to confess, "The truth is that there is not and cannot be any one general solvent for [allocating the burden of proof in] all cases. It is merely a question of policy and fairness based on experience in the different situations." *Id.*, at 275.

14. The importance of the burden of proof is minimized in this case because each party presented some evidence relevant to the voluntariness of the tribe's change in status. Therefore, it is unlikely that the issue was decided for lack of evidence. The jury's problem was not so much weighing conflicting evidence as choosing between plaintiff's and defendants' interpretations of the historical data.

the important concerns or thought processes of the Indians. Consequently, in order to prove that abandonment was voluntary, defendants would probably have to try to prove a negative, the absence of coercion.[15] Therefore, we conclude that the court did not err in leaving the burden on the plaintiff.

## IV.

Plaintiff argues that the special verdicts returned by the jury are irreconcilably inconsistent and fatally ambiguous. As a consequence, plaintiff suggests that it was error to enter judgment and that the only solution was to order a new trial. Where a trial court has entered judgment on the basis of a jury's special verdicts, "an appellate court must affirm if there is a view of the case that makes the jury's answers to the interrogatories consistent." *Atlantic Tubing & Rubber Co. v. International Engraving Co.*, 528 F.2d 1272, 1276 (1st Cir. 1976). This duty is drawn, at least in part, from the Seventh Amendment.

> "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962).

We rule that the jury's answers can support the judgment.

■ The alleged inconsistency is that there is no evidence that could support the jury's conclusion that the tribe that existed in 1842 voluntarily abandoned tribal status at some time prior to 1869 when the jury found it was no longer a tribe. On the evidence of the case, viewed most favorably for defendants, the district court found that the jury could (though it was by no means

compelled to) conclude that the tribe had assimilated into general non-Indian society, and that that assimilation was voluntary. *Mashpee Tribe v. Town of Mashpee, supra,* 447 F.Supp. at 948–49.

In agreeing with the district court on this issue, we stress that our review constrains us to look at that evidence and the inferences reasonably drawn therefrom which support the special verdicts. We add that there is not an abundance of evidence relating either to the external activities or internal attitudes of the Indians at Mashpee during this quarter of a century. Nevertheless, even apart from the burden of proof, which we have held to be correctly imposed on appellant, the evidence and inferences were sufficient to support a jury finding that what was a tribe in 1842 had voluntarily assimilated into the general society by 1869.

These are the factors on which we rest that conclusion.

—First, the same intense political activity that could have led the jury to find tribal existence in 1834 and 1842 was novel for the group and limited in time and scope of objective. The goal of becoming a district with certain rights of self-government was achieved in 1834. That of being permitted to divide common land among Indian members of the community was achieved in 1842. The jury could infer that the tribal organization, having accomplished its purposes, became less important to the community.

—While the political structure of Mashpee, governed by "proprietors", remained essentially the same from 1834 to 1870, the jury could have found the seeds of change to have been sown when division of the common land was authorized in 1842. There was evidence of substantial in- and out-migration throughout these years, the newcomers including Indians, white, and other non-white people, becoming both pro-

---

**15.** This burden is placed on the government when it seeks to introduce a defendant's confession in a criminal case. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Christian,* 571 F.2d 64, 69 (1st Cir. 1978). But the defendant's right at issue is constitutionally protected, and the evidence available to the government is much fresher and more within the control of the burdened party.

prietors and tenants. Testimony of Mashpee inhabitants, both Indian and other nonwhites, at a legislative hearing in 1869 revealed sad experiences in land use such as the gradual loss of the forests, inability to use the land as security for loans, and pauperization of non-Indian husbands of proprietors, observations suggestive not so much of tribal cohesiveness and communality as of individual aspirations and frustrations. Indeed, one of the speakers told of many young people who had left Mashpee rather than live on common lands and returned only after the law of 1842.

—The report of an 1869 legislative hearing on a petition to remove restrictions on the alienation of land and to grant citizenship could also have supported the special verdict. Two of the three Mashpee selectmen, with others, had filed the petition. Others opposed. At the hearing six spoke for removing restrictions, four spoke against, and one seemingly straddled. Of the four opponents, two took the position that action was premature and wanted from ten to thirty-four more years before full citizenship and freedom to alienate were given. In a straw vote 14 voted for removal of restrictions and 26 voted against removal, while the vote for immediate citizenship was 18 to 18. While this report shows a split opinion, the jury was entitled to give weight to the endorsement of removal of restrictions on alienation by a majority of the selectmen (and the reflection of the larger community of 300–400 Mashpee inhabitants), to the opinions of the two apparently most venerated leaders, who both wanted to secure equal rights without special restrictions and disagreed only as to the timing of the change, and to the vote of approval at the first meeting of the newly authorized town the following year. The desire of Mashpee residents to be able to alienate land, though not in itself inconsistent with tribal existence, could support the inference that the residents had begun to focus more on personal than communal advancement; more on the ability of individuals to compete as members of society than of the tribe to resist society's impositions.

—Under the court's instructions the jury was allowed to consider evidence of Mashpee life shortly after the terminal year, 1869. Such evidence as there was indicated that many of the young men were serving on vessels, and that farming, some manufacturing, a shipping enterprise, a hotel, and a burgeoning hunting and fishing business constituted the economy. Also, the town took over the remaining common land. From this too, particularly in the absence of any evidence tending to show a discretely "Indian" community, the jury could have inferred that Mashpee was voluntarily trying to carve a destiny like many another rural and coastal town; to change from an "Indian community" to a community that happened to be made up largely of Indians.

Neither party took the position at trial that the Mashpees' tribal status or lack of status changed in any significant way in the period between 1842 and 1869. Indeed defendants' counsel often spoke of the period from 1834 to 1870, during which Mashpee was a district, as a distinct era to be dealt with as one unit. Consequently, neither party focussed attention on the voluntariness of whatever changes did take place in Mashpee between 1842 and 1869. Nevertheless, the special interrogatories asked the jury to make a separate decision about each of the dates. Plaintiff cannot now take advantage of having failed to discuss a distinction that was apparent to the jury, and at least suggested in the court's instructions (see quotation in next paragraph).

 The verdicts' alleged ambiguity derives from the following passage in the charge:

"It is, I suppose, possible that by reason of circumstances, tribal existence be so suppressed that it be in limbo for a period, that it not be manifest for a period without there being abandonment. If you find that there was, by reason of the activities in 1869, 1870, a conscious abandonment of tribal status, then you would not be warranted in finding the existence of a tribe in 1976. However, if you find there was no such abandonment, then you

should consider the [continuity] question."

Plaintiff suggests that if the jury thought tribal existence were temporarily suppressed in 1869 it would not know whether to answer the interrogatory yes (there was a tribe but it was suppressed) or no (temporarily there was no functioning tribe). The trial court agreed that this ambiguity was present at least as to the 1790 question, *Mashpee Tribe, supra,* 447 F.Supp. at 949,[16] but it did not address the possible ambiguity of any other answer.

First, we note that plaintiff did not point out the possible ambiguity during its objections to the instructions at the close of the charge. That was the appropriate time, and plaintiff then had all necessary information. General objections relating to the abandonment issue were not sufficient to give the court an opportunity to correct the charge, had it so desired, before the jury began deliberations. Unlike the alleged inconsistency in verdict, any ambiguity was discoverable on the face of the charge, and was not created by the verdict. The fact that this argument was not specifically made until the verdict had come in suggests that plaintiff did not consider this a problem until it discovered its case badly needed some new source of life.

Moreover, we are not persuaded that the interrogatory relative to 1869 was so ambiguous as to bar entry of judgment. The court clearly instructed that a tribe could cease to exist only voluntarily and that outside suppression would not constitute abandonment. "Abandonment cannot be found because of conditions which have been imposed from the outside." We must assume that the jury listened to and understood the court's entire charge. Therefore, if it thought that tribal existence were suppressed, the jury would have had to find that the tribe had not ceased to exist and would have answered "yes" to the interrogatory. The fact that the jury answered "no" as we have already discussed, is a legitimate verdict based on the jury's view of the facts. A new trial was not required on the basis of the special verdicts.

## V.

Finally, plaintiff maintains that the trial court failed to investigate sufficiently the impact on the jury verdict of an anonymous phone call made to one of the jurors, and that a new trial therefore is mandatory. Although the trial court's inquiry was terminated too soon to have been fully satisfactory, we find that it acted within the bounds of its discretion in conducting the investigation as it did and that its conclusion that the communication was not prejudicial is supported by a record which "provides an adequate basis for review". *United States v. Doe,* 513 F.2d 709, 712 & n. 3 (1st Cir. 1975).

Approximately three months after the close of the trial, the court received a communication from one John Doe, a resident of Falmouth, Massachusetts, claiming that while riding a commuter bus during the time of the trial he had been approached by a man who identified himself as a juror in the Mashpee case and that the juror·commented that he had received an anonymous phone call about the case. The court promptly asked Mr. Doe to attend a hearing concerning his communication to the court and notified the parties. With counsel for both sides present, Mr. Doe testified as to the contents of his bus conversation with the juror, including his advice that the juror inform the court about the phone call. He also suggested, although somewhat unclearly, that the juror had engaged in a pattern of mentioning his involvement in the Mashpee case to other commuters.

The court then determined that a further inquiry was necessary and the next day a hearing was held with the juror in question, again with counsel in attendance. The juror testified that he had received the call, and had mentioned it to a fellow commuter but had not sought to inform the court

---

**16.** Massachusetts imposed a guardianship on the Mashpees in 1788. The court decided this ambiguity was immaterial, however, because 1790 was an irrelevant date. That conclusion is not challenged before us.

about the incident. In response to the court's questioning, the juror stated that he had received the call about two or three weeks before jury deliberations in which the speaker said, "You know which way you better go" and then hung up. He did not recognize the voice, and testified that "the funny part about it" was that the caller did not indicate which "way" he should go. He also mentioned that he had received a series of calls in which he only heard a click as he picked up the receiver, both before and during his service as a juror, and that he had not been certain about the motivation for the calls. Finally, he maintained that he had never discussed the merits of the case outside of the jury room.

 The court was unwilling to extend its investigation into several areas that plaintiff's counsel wished to explore. Although allowed, over defendants' over-zealous objections, to ask whether other jurors had told this juror that they had received calls, to which he responded in the negative, plaintiff's counsel was not permitted, again upon defendants' counsel's objection, to question whether this juror had told other jurors about his anonymous phone call.[17]

While it clearly would have been better practice to have allowed this line of questioning, the court did satisfy itself that "while what happened was unfortunate and improper, it did not impeach the jury's verdict in any way at all", describing the phone call as "neutral" and not "prima facie prejudicial". The call was ambiguous, giving the juror no clues as to which way he should vote and not attaching any consequences to choosing the wrong way. *Compare Krause v. Rhodes*, 570 F.2d 563, 566 (6th Cir. 1977). It occurred several weeks before jury deliberations began and was not reported. The juror apparently drew no conclusions concerning its intended message, and our reading of the record indicates that not only was the juror not at all shaken by the experience but that he seemed to attach little significance to it.[18] *Compare Remmer v. United States*, 350 U.S. 377, 381–82, 76 S.Ct. 425, 100 L.Ed. 435 (1956), *and United States v. Spinella*, 506 F.2d 426, 428 (5th Cir. 1975) *with United States v. Brumbaugh*, 471 F.2d 1128, 1130 (6th Cir. 1973). His only concern was that the court understand that he never intended to act improperly, stating that he had "peace of mind" concerning the trust the court had placed in him as a juror. Furthermore, his testimony that none of the other jurors had mentioned having received a call at least suggests that the subject of phone calls had not arisen in discussions among the jurors. But even if we assume that had the obviously proper question been asked the juror would have responded that he had told his fellow jurors of the call, because of the remoteness in time, the isolated nature of the call, the ambivalence of the message conveyed, and the lack of identifiable source and threatened consequences, we are unable to say, or to find authorities which under similar facts have held, that plaintiff "was deprived of a fair

17. Defendants, in their briefs, suggest that the court did in fact ask the juror whether he had told other jurors about the phone call, pointing to this question: "[What is] your best recollection, whether you talked to one person or more than one person on this subject?" As the record clearly shows, this question was a rephrasing of opposing counsel's inquiry concerning communication to other passengers on the bus, and not other members of the jury panel. This misconstruction of the record, it seems to this court, cannot be explained on any excusable basis.

18. We are somewhat puzzled by the court's statement to counsel that:

"The only thing that would seem to me to be left and asked of the juror is whether his decision on the case was affected by the call which seems to me not an inappropriate question at this point, but it is my present disposition to bring this inquiry to a close. I'm satisfied that while what happened was unfortunate and improper, it did not impeach the jury's verdict in any way at all."

It would have been preferable for the court to ask the juror this obviously relevant question. But, given counsel's failure to pursue the question suggested by the court, indicating to us that it was apparent that the effect of the call on the juror was minimal, and the court's conclusion that the incident was insufficient to upset the jury process, based in part on the juror's demeanor, we do not consider the omission a fatal one.

trial and an impartial jury". *United States v. Doe, supra,* 513 F.2d at 713. *See Allen v. United States,* 376 F.Supp. 1386, 1390 (E.D. Pa.1974), *aff'd,* 511 F.2d 1392 (3d Cir. 1975).

▮▮▮ Plaintiff contests several other restraints placed upon the investigation by the court, maintaining, first, that the court should have called in the jury members to determine whether they had received similar communications during the trial and, second, that the court should not have ordered counsel to refrain from making an independent investigation into whether the juror in question had had impermissible conversations with other passengers on his commuter bus. We reject both contentions. First, it was well within the court's discretion to refuse to question other members of the jury panel. Plaintiff's assertion that the call received by this juror was *prima facie* evidence of possible calls made to other jurors and thus necessitated further inquiry is unpersuasive. The juror testified that no other juror had mentioned having received a communication, giving the court reason to believe that the calls had been limited to this one juror. Moreover, as the court explained at the inquiry, this juror was the only member of the panel who was residing in the area that was being contested in this law suit, and thus was a particularly likely target for crank calls. *See Allen v. United States, supra,* 376 F.Supp. at 1388–90.

We also find that the district court acted within its discretion when it strongly discouraged counsel from independently investigating possible further misconduct on the bus [19] and refused to pursue the inquiry itself. It is true that Mr. Doe, the commuter who brought this matter to the attention of the court, testified that this juror had discussed the case with other passengers on the bus, although he could say nothing about the content of those alleged conversations, noting that he "was asleep most of the time". The juror, however, flatly denied having ever mentioned more than the fact that he was on the jury and testified, "[t]his case per se, merits, any testimony, anything said in the courtroom, I never discussed it or not knowingly anything that would be—I've been fairly discreet, I believe, most discreet." The court expressly found Mr. Doe to be an unreliable witness, and stated, "The juror strikes me as a pretty solid [person], and I don't think there is anything to suggest he was doing anything improper." The court was in a position to evaluate the demeanor and credibility of both witnesses, *see United States v. Brumbaugh, supra,* 471 F.2d at 1130, and to conclude that no further inquiry into events on the bus, by the court or counsel, was warranted.

## VI.

▮▮▮ Having rejected each of plaintiff's assignments of error, we must affirm the judgment of the district court. Defendants' separate appeal in Nos. 78–1273 and 78–1274, therefore, need not be decided. Defendants appealed from the district court's construction of the "white settlements" exception to the Nonintercourse Act. *Mashpee Tribe, supra,* 447 F.Supp. at 950. We reject defendants' suggestion that we should afford them an advisory opinion on the subject because of its intrinsic importance and possible relevance to other suits now pending or soon to be filed.

*Affirmed, except as to that part of the judgment below of which prosecution of the appeal was deferred by order of this court entered August 11, 1978. One third of their costs to defendants.*

BOWNES, Circuit Judge (concurring).

I concur with my brothers in all but one respect of the opinion, namely its treatment of the lower court's instructions on the definition of "tribe." The majority suggests that it is not ruling on whether the instructions are correct as a matter of law, but

---

19. The court did not, as plaintiff suggests, order counsel to refrain from an independent investigation. At one point he so "instructed" him but later stated that "I think that would be a very, very foolish thing for you to do, . . . extremely foolish. If you insist on doing it, you may have a right to do it, but I think it would be very bad judgment."

simply ruling that the instructions conform to the plaintiff's view of the law. *Ante* at 587. There is an understandable reluctance not to be placed in a straight-jacket by embracing one definition for all time and for all circumstances. However, I believe that the district court's instructions were correct as a matter of law, that they comported with the applicable standards as set forth in *Montoya v. United States,* 180 U.S. 261, 266, 21 S.Ct. 358, 45 L.Ed. 521 (1901), and that we have a duty to find the instructions legally correct or incorrect and not merely whether they harmonized with one party's view of the appropriate legal standards. Both the district court's delineation of what constitutes "tribe" as well as this court's extensive explication should, in my opinion, serve as a firm foundation for future cases dealing with this sensitive and difficult issue. I would not shy away from reliance on these instructions and our comments thereon in future cases.