**MASHPEE TRIBE, Plaintiff,**

v.

**TOWN OF MASHPEE et al., Defendants.**

**Civ. A. No. 76–3190–S.**

United States District Court, D. Massachusetts.

March 24, 1978.

---

Native American Rights Fund, Barry A. Margolin, Moshe Genauer, Boston, Mass., Thomas N. Tureen, Dennis M. Montgomery, Calais, Maine, Lawrence D. Shubow, Ann Gilmore, Shubow, Stahlin & Bergstresser, Boston, Mass., for plaintiff.

Allan Van Gestel, James J. Dillon, Goodwin, Procter & Hoar, James D. St. Clair, Stephen H. Oleskey, William F. Lee, Hale & Dorr, Andrew J. McElaney, Jr., Asst. Atty. Gen., Commonwealth of Massachusetts, Boston, Mass., Selma R. Rollins, Rollins, Rollins & Fox, Brookline, Mass., Morris Kirsner, Edwin J. Carr, May, Bilodeau, Dondis & Landergan, Thomas Otis, Boston, Mass., Thomas B. Shea, Gargiulo & Holian, Cambridge, Mass., for defendants.

## MEMORANDUM AND ORDER FOR JUDGMENT

SKINNER, District Judge.

This action was brought by the Mashpee Tribe of Indians to recover possession of

tribal lands allegedly alienated from the tribe in violation of the Indian Nonintercourse Act (25 U.S.C. § 177). The defendants' answer put in issue whether the plaintiff group was in fact an Indian tribe for purposes of the Act at the time suit was brought and at other times deemed by the parties to be critical. The threshold issue of tribal existence was severed for separate trial by order of the court.

After forty days of trial, the issue of tribal existence was submitted to the jury in the form of special interrogatories. The issue of tribal title was reserved as a matter of law for the court to resolve after receiving the jury's answers. The dates chosen in the special interrogatories were those deemed significant by the parties with respect to their several legal theories. I am of the opinion that several of these dates are not significant, as shall hereinafter appear, but they were included to preserve the widest possible scope of review of the legal issues. The interrogatories and answers were as follows:

1. Did the proprietors of Mashpee, together with their spouses and children, constitute an Indian tribe on any of the following dates:

a. July 22, 1790: The date of the enactment of the first version of the federal Nonintercourse Act? ·

*No*

b. March 31, 1834: The date on which the District of Marshpee was established. [sic]

*Yes*

c. March 3, 1842: The date on which formal partition of land in the District of Marshpee among the proprietors of Marshpee and their children was authorized by act of the legislature of the Commonwealth of Massachusetts?

*Yes*

d. June 23, 1869: The date on which all restraints on alienation of land held individually by Indians and people of color known as Indians were removed by act of the legislature of the Commonwealth of Massachusetts?

*No*

e. May 28, 1870: The date on which the Town of Mashpee was incorporated by act of legislature of the Commonwealth of Massachusetts: [sic]

*No*

2. Did the plaintiff group, as identified by the plaintiff's witnesses, constitute an Indian tribe as of August 26, 1976: The date of the commencement of this law suit?

*No*

3. If you find that people living in Mashpee constituted an Indian tribe or nation on any of the dates prior to August 26, 1976 listed in Special Question No. 1, did they continuously exist as such a tribe or nation from such date or dates up to and including August 26, 1976?

*No*

■ The case is now before me on the defendants' motion for judgment of dismissal on the merits based on the jury's answer. Plaintiff has filed an opposition thereto claiming that the jury's answers are fatally inconsistent and on their face violate the court's instructions. It appeared at argument that the plaintiff's preferred remedy is a new trial, and that indeed appears to be the only alternative to the entry of judgment for the defendants. All parties agree that the plaintiff must establish its status as an Indian tribe as of the date that the action was commenced in order to maintain this action in the form elected by the plaintiff.

## I. HISTORICAL BACKGROUND

The basic history of Mashpee is not disputed, and a review thereof is necessary to the resolution of the pending motions. For simplicity's sake, I shall refer to the people claiming to be a tribe and their Indian ancestors as Indians [1] and everybody else as non-Indians, except where it is necessary to differentiate non-Indians of African and European ancestry who will be referred to

---

1. I recognize that the plaintiff's claim of being Indian is contested by the defendants, and that the evidence indicates considerable racial mixture among this group.

respectively as blacks and whites. References to statutes and deeds in the following exposition include my legal interpretation and construction, to which the parties do not in every case agree.

In 1665, Richard Bourne, a Christian missionary to the Indians, desired to gather a community of Christian Indians in the area surrounding the Indian village of Mashpee and comprising the present Town of Mashpee and parts of present Sandwich and Falmouth. Accordingly, a deed was executed from two Indian leaders named Weepquish and Tookenchosen to five other named persons for the benefit of the "South Sea Indians." The status of the grantors and their capacity to grant title is unknown. One of the expert witnesses gave an opinion that the grantees were a group of village headmen who constituted the ruling council of a tribe known as the Cotichesetts, inhabiting the area of Mashpee and eastward to present Hyannis. The area granted contained a group of small villages of ten or twenty families, the remnants of a once numerous and thriving agricultural community largely wiped out in 1617 by an unidentified epidemic.

In 1666, Quichatisset, the Sachem of Manomet, relinquished his authority over the area and its inhabitants by a deed to substantially the same grantees. There is no evidence as to the form of governance of the area or its inhabitants from this period until 1723.

In 1685, apparently at the instance of Shearjashub Bourne, the son of Richard, the General Court of the Plymouth Colony granted the area to the South Sea Indians *and their children*, subject to a restraint on alienation, namely, that no land should be sold to an Englishman without the consent of all the Indians and the permission of the General Court.[2] It is on this grant that the plaintiff must base its claim of title. *Johnson v. McIntosh,* 8 Wheat. 543, 5 L.Ed. 681 (1823). In 1692, the Plymouth Colony was merged with the Province of Massachusetts Bay, and the powers of its General Court were preempted by the General Court at Boston.

By 1723, Mashpee had been organized as a proprietary. As a result of the 1685 deed, Mashpee differed from other proprietaries in an essential respect. Mashpee was designed to be a permanent Indian plantation, in which the land was to be held in common, entailed, and with a restraint on alienation into the indefinite future. Other proprietaries were designed for founding and developing new communities. They were self-liquidating; the common land of the proprietary was sold off to settlers who organized towns.

In 1746, the General Court appointed guardians to control the finances of the plantation.

These guardians apparently used their position to exploit their wards, and the efforts of the Indians to obtain redress through the General Court were unavailing. By a remarkable feat of daring and resolve, one of the Indians (a Mohegan Indian from Connecticut, who had settled in Mashpee) carried a petition to the King of England. As a result, in 1763, the Mashpee Proprietors were given a large measure of self-government, including the right to appoint constables to protect their woodlots from depredation by neighboring non-Indian settlers.

During the Revolutionary War, the Indian men of Mashpee fought against the British, and a very large number of them were killed. After the war, there were said to be 70 widows in Mashpee out of a population of a few hundred. As one might suppose, this situation encouraged a considerable influx of unattached non-Indian males, mostly black, but including four escaped Hessians and a Portuguese sailor.

---

2. Plaintiff's Exhibit 38: "The Court, on considerations of the p'mises, doth soe far confirme said land to the said Indians, to be perpetually to them & their children, as that no part of them shall be granted to or purchased by any English whatsoeuer, by the Courts allowance, without the consent of all the said Indians." The case has been tried, and I think properly so, on the assumption that "English" should be broadly construed to include all non-Indians.

This influx apparently had a disintegrating effect, as a result of which the General Court reimposed guardians, whose approval was required for all significant actions.

By 1833, as under the previous guardians, the Indians felt that the guardians were not protecting them, but exploiting them. The precipitating issue was the cutting of wood from Indian land by outsiders. There was some violence. The Indians hired a lawyer and filed a petition with the General Court for relief from the guardianship. At the same time, the Indians rejected the ministry of the Reverend Phineas Fish, who had been sent down from Harvard to carry on "the blessed work of converting the poor Indian," and established their own Baptist Church under an Indian preacher, "Blind Joe" Amos.

In response to this well organized effort, the General Court created the District of Mashpee in 1834. Under the district organization, Mashpee (or "Marshpee") was governed substantially in the manner of a Massachusetts town, with the exception that certain transactions affecting the common lands and the treasury were subject to the approval of a Commissioner appointed by the Governor. The Commissioner also served as Treasurer. By successive legislation, the Commissioner's power was reduced to that ordinarily exercised by a Town Treasurer and eventually the office was filled by election of the proprietors of the district.

The 1834 Act also confirmed the allotment of land to those proprietors who had occupied and improved it, and required the Commissioner to keep a record of the allotments, as well as a list of proprietors. All of the land in the district, whether held in common or in severalty, was exempt from execution, and the proprietors were exempt from state and county taxes.

From 1834 onward, records of the district show that the proprietors voted various ordinances, including regulation of herring fishing. There are no existing records showing such regulations prior to this time.

In 1842, the General Court passed another Act which substantially altered the land title within the district and defined who were to be deemed proprietors. Each proprietor was to be allotted a sufficient portion of the common land of the district to bring his holdings (including the acreage confirmed to his use by the 1834 Act) up to sixty acres. All the land not so allotted remained common land under the control of the Selectmen of the District. The title acquired by each proprietor was described in Section 8 of the Act as follows:

> The lands set off in severalty to the proprietors, and all other lands held or acquired by them, shall have all the incidents of estates in fee, except the right of transfer, conveyance or devise to other than a proprietor, and excepting further, that the said lands shall not be liable to be taken in execution; . . . [various detailed provisions for allotment, and for the preservation of the rights of minors] . . . And no land now belonging to a married female proprietor, or which may be allotted to her, or which she may hereafter acquire or inherit in her own right, shall, without her consent, be conveyed or leased, or the wood sold therefrom; and all contracts therefor by her husband, in which she does not join, shall be void: *provided, also,* that upon the death of any proprietor leaving no heirs, all his interest in the lands of the district shall escheat to the proprietary.

In 1869, the Governor of the Commonwealth proposed legislation relieving all the Indians in Massachusetts of their legal disabilities and admitting them to full citizenship. A legislative committee held a hearing in Mashpee. The questions being considered were citizenship and removal of the restraints on alienation of the land. About 40 people appeared, including several non-Indian husbands of female Indian proprietors. Some of the Indians were in favor of citizenship and removal of the "entailments" on the land, because under existing restrictions there was no way that an Indian could acquire mortgage money for improvements, or liquidate his land holdings to go into commerce. The non-Indians also favored elimination of restraints on aliena-

tion because they wished to be able to vote and hold property in Mashpee in their own right. "Blind Joe" Amos, by then describing himself as among the oldest inhabitants, opposed the changes on the ground that the Indians were not yet ready to deal on an equal footing with outsiders and would imprudently sell off all their land. He was in favor of the removal of the restrictions, but not until the generation then in school should come of age. A vote was taken which was split 18 to 18 on the question of citizenship and 26 to 14 in opposition to the removal of the restrictions on the land. (Plaintiff's Exhibit 180, "Phonographic" Transcript of Hearing.)

Nevertheless, in 1869 the General Court passed an act granting citizenship to the Indians, removing their legal disabilities, and releasing the restraints on alienation of land imposed originally in the 1685 deed and carried forward in the 1842 Act. In 1870, Mashpee was incorporated as a Town. The common land of the District was transferred to the Town, and upon application the Superior Court was authorized to order the sale thereof by Commissioners appointed for the purpose. There were some three thousand acres of common land remaining after the allotments of 1842. Most of this land was sold, presumably to the then inhabitants of Mashpee. *See Coombs, petitioner,* 127 Mass. 278 (1879).

It is these two acts of the General Court that the plaintiff complains of as violations of the Nonintercourse Act.

At this point, the ancestors of the present Indians had complete control of substantially all of the land in Mashpee, and they retained it for the next seventy years. "Blind Joe" Amos' prediction did not come true. The Selectmen of the District became the Selectmen of the Town, and the Board was composed of Indians until 1968,[3] and a majority were Indians until 1972.

In the early part of the 20th century, it appears that some small part of the Town was sold to outsiders and developed as summer property. Up through the 1930's and early 1940's, however, the area remained substantially as it had been from the 1870's on. Indian witnesses testified that when they were growing up in Mashpee the land was still open and unfenced by its Indian owners, and the upland and shores were readily accessible to everyone for hunting, shellfishing and recreation.

By the 1930's, however, agriculture in New England was in general decline, and so it was in Mashpee. Some land was taken from Indian owners by the Town for taxes, but at least some tax title property was purchased at tax title auction by other Indians.

In the early 1950's and thereafter, the building of super highways to Cape Cod and the pressure of population moving out from the cities encouraged land developers to buy land on Cape Cod and in Mashpee. Some of the Indians sold their land during this period, and some retained their land. While each land sale doubtless appeared profitable to the individual seller at the time, the Indians now find that the aggregate of these land sales has substantially altered the life of their community, leaving them in the minority. The free access to upland and shore that they so long enjoyed has disappeared.[4]

It is principally these land sales by individual Indians to non-Indians which the plaintiff seeks to have declared null and void as in violation of the Nonintercourse Act.

There was virtually no evidence introduced concerning life in Mashpee between 1870 and 1920. There was evidence that several students at the Carlisle Indian School had given "Mashpee" as their tribal designation during this period, but also that the grandfather of one of the witnesses had deliberately refrained from teaching his children the Indian language, because he wanted them to use English.

---

3. With one exception in the early 20th century.

4. This history parallels that of most small towns in eastern Massachusetts and Rhode Is-land, and more recently in southern Vermont, New Hampshire and Maine.

In 1920, there was a revival of interest in Indian customs. From 1928 to the present, there has been a "Pow-wow" held at Mashpee, more or less annually. This is a three or four day celebration featuring Indian dances and songs. Most of these are borrowed from Plains Indians, however, as are many of the decorative symbols and styles of dress, because the ancient modes of east coast Indians have been lost. From the early 1920's through the early 1940's, there were individuals who were sometimes recognized as chiefs and medicine men of the Indian community in Mashpee. The method by which the individuals were selected and their leadership functions were not revealed by the evidence. In 1956 the Sachem of the Wampanoag Nation appointed Earl Mills Chief of the "Mashpee Tribe," on the petition of some of the Indians in Mashpee. Mr. Mills remains the Chief to this day. Mr. John Peters was similarly appointed as Medicine Man, and filled that post up until the time of trial, when he was appointed Supreme Medicine Man of the Wampanoag Nation. At one time there was a Tribal Council which met from time to time, but it appears that this group's functions, if any, were primarily social. In 1974 the Mashpee-Wampanoag Indian Tribal Council, Inc., was incorporated. It has acted as representative for the Indians in Mashpee with respect to securing federal educational grants and Comprehensive Employment and Training Act projects, and has been designated as the official representative of the Mashpee Indians in an executive order of the Governor of the Commonwealth. It lobbied for the passage of the executive order, and also secured the title to fifty-five acres of land in Mashpee granted to it by the Town, to be used for tribal purposes.

The leadership functions of the Chief, the Medicine Man and the incorporated Tribal Council, and the extent to which these individuals and the corporation were recognized as significant leaders by the Indians, were the subject of extensive and conflicting testimony.

## II. SIGNIFICANT TIMES

As stated, the designation of the various times in the interrogatories to the jury was intended to preserve the rights of the parties with respect to their legal arguments. There is no doubt, and no disagreement, about the significance of August 26, 1976, the date that this action was commenced, because the right sought to be enforced is exclusively a tribal right.

■ The defendants claim that 1790 is a critical date because the original Trade and Intercourse Act and its successors only deal with tribes existing at the time of original enactment. They go further and assert that the Congressional power to "regulate Commerce . . . with the Indian Tribes" granted in Art. I, § 8, cl. 3, restricts congressional action to existing tribes. It is doubtful if authority to regulate Indian affairs is limited to the Commerce Clause, but, in any case, the defendants' position flies in the face of a basic canon of construction of organic law. There is no support for it in the cases; in fact, quite the contrary, e. g., *Oliphant v. The Suquamish Indian Tribe*, —— U.S. ——, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). In my opinion, the 1790 date is entirely without significance in this case.

■ The plaintiff insists that 1869 and 1870 are crucial dates. Since the jury's return the defendants have enthusiastically joined in this position. If the proprietors of Mashpee were a tribe in 1870, the common land held by the District of Mashpee would very likely be tribal land, and its division or sale pursuant to the statute of 1870 might well have been a violation of the Nonintercourse Act. In my opinion, 1870 is significant with respect to approximately three thousand acres[5] of the former common land, but not in any other respect.

5. The location of these acres was not revealed in any evidence adduced at this stage of the case.

■ With respect to the allotted land, however, the 1869 statute was in effect a release by the successor of the original grantor of a restraint on alienation included in the 1685 deed from the General Court of the Plymouth Colony. It might also be perceived as the grant of a right of free alienation, but it was a grant that flowed *to* the Indians not *from* the Indians. It flowed not to an Indian nation or tribe of Indians, but to individual Indian holders of estates in fee. It is only a "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians," that is invalidated by the Nonintercourse Act. None of these occurred in 1869, and 1869 is therefore not a significant date.

■ The statute of 1842, in contrast, did bring about a basic change in the title to the land in Mashpee. Common land was converted by operation of the statute into land held in severalty. If, as the jury determined, the proprietors constituted an Indian tribe at this time, what I assume was tribal land was perforce conveyed to individual Indians. The plaintiff does not wish this to be considered a critical date, because if it is, the operation of the Nonintercourse Act invalidates the title of the Indians themselves, some of whose present titles doubtless derive directly from the original proprietors. (Other present-day Indians own land in Mashpee which they bought from non-Indians; their title is, of course, no better than that of the non-Indians in their chain of title.) The Nonintercourse Act does not by its terms provide for any exception for the conveyance of land from a tribe to individual Indians, and plaintiff has cited no case creating a judicial exception. 1842, therefore, is a significant date.

■ The 1834 Act presages the 1842 disposition of the land, but, while it provides for[5] permanent, transferable rights of use and occupancy, it does not, strictly speaking, affect title. Use and occupancy are interests in land nevertheless, and 1834 may be a significant date to that extent. There was some evidence that allotment of tribal land for the use and occupancy of particular families was characteristic of tribally held land and not inconsistent with tribal title. Whatever significance the 1834 Act may have had seems to me to have been subsumed in the 1842 statute.

■ The significant dates are therefore 1976 and 1842, and 1870 as to approximately three thousand unidentified acres.

## III. INCONSISTENCY OF RESPONSES AND CONFUSION OF JURY

Plaintiff's attack on the jury's finding that it was not a tribe in August of 1976 is not based on the evidence adduced with respect to 1976, but on the assertion that the pattern of the jury's other answers fatally impeach that finding. The argument has two branches:

1. There was no material change in the circumstances of the Mashpee proprietors between 1842 and 1869 which warrants the jury's finding that they were a tribe in 1842 and were not in 1869. Since I had instructed the jury that tribal status once abandoned could not be regained, the mistake with reference to 1869 required a negative answer with respect to 1976. Thus the answer with respect to 1976 cannot be the basis of a judgment adverse to the plaintiff.

2. The finding of the jury that the proprietors were not a tribe in 1790 is inconsistent with the finding that they were a tribe in 1834. Plaintiff claims that the instructions limited the time for the emergence of a tribe to the period before 1723. The proprietors would not therefore have become a tribe between 1790 and 1834. The finding thus reflects either a misunderstanding of the instructions, or a refusal by the jury to abide by them, either of which vitiates all of the jury's answers including the answer that the plaintiff was not a tribe when the suit was commenced in 1976.

## IV. OPINION

■ In my view, the evidence would support the jury's finding that between 1842, when the Indians in Mashpee were active in establishing self-determination and asserting their right to their own customs, and 1869 when the legislative hearing was held, the proprietors had reoriented their efforts toward assimilation into the general non-Indian community. This is arguably the tenor of the 1869 statements, the differences between the speakers involving only the timing of the proposed changes. (Plaintiff's Exhibit 180.) I instructed the jury that they could also consider the events of the immediately prior and succeeding years in evaluating the situation at any one of the given dates, insofar as they bore on the attitude and customs of the Indians. The absence of any indication of Indian self-identification, or of the establishment of tribal common land in the years immediately following 1869, at a time when the Indians exercised virtually complete control of the area, may have had some bearing on the jury's response. From all of the circumstances, the jury was entitled to find that tribal identity had been abandoned at some time between 1842 and 1869.[6]

■ The basis of the plaintiff's argument with respect to 1790 is the following section of the original instructions to the jury:

> You may also consider whether the group started off in 1665 as a mere remnant or an accumulation of Indians from here and there and acquired a tribal status by reason of organizing itself in a tribal manner, somewhere in the course of time between 1665 and 1723. [Tr. 40–53, 1. 1–6]

The plaintiff treats this statement as a limitation. It seems to me that the word "also" defeats that interpretation, but the lack of further amplification certainly left the matter unclear at that point.

Unfortunately, during the long colloquy with counsel after the instruction, confusion was compounded by my contradictory statements regarding the foregoing, neither of which were correct statements of the applicable rule. [Tr. 40–107, 1. 1–2; Tr. 40–86, 1. 8–13.] Fortunately, these statements were out of the presence of the jury, and could not have affected their answers.

In any case, the supplementary instructions permitted the jury to find the evolution of a tribal organization occurred at any time "in their course of history." [Tr. 41–17, 1. 16 through 41–18, 1. 11.] This answers the plaintiff's objection.

■ There remains yet one more ambiguity in the jury's 1790 answer, however, which should be pointed out, even though in my opinion it is of no consequence. The 1790 date falls just after the imposition of guardians under the statute of 1788. I advised the jury that an involuntary repression of tribal activity would not constitute an abandonment of tribal existence, but I did not say how they should answer if they found that such repression did exist; *i. e.,*

> *Yes* (there was a tribe, but it was unable to function)

or

> *No* (There was not a functioning tribe for the time being)

The jury's actual negative answer is therefore susceptible to two interpretations:

(1) That the tribe did not evolve until sometime after 1788.

(2) That the tribe had evolved sometime prior to 1788, but was in temporary eclipse because of the guardianship.

On the evidence the latter is the more likely conclusion, but there is no way of telling what the jury thought.

In my considered view, it doesn't matter, because as I have said, 1790 is in my opinion a totally irrelevant date. The answers of the jury are perfectly rational under either

---

**6.** These various instructions, including the instruction that tribal status may be abandoned, are challenged by the plaintiff as a matter of law, but I have in effect already ruled on these matters.

view, and do not reflect such lack of understanding or lack of compliance with the instruction as to vitiate the remaining answers.

 Aside from all of these problems, the answer of the jury that the plaintiff was not a tribe for purposes of the Nonintercourse Act[7] in 1976 was fully supported by the evidence of the circumstances of the plaintiff's existence in Mashpee at that time.

## V. ORDER

Accordingly, the answers of the jury to the special interrogatories shall stand. These answers require that this action be DISMISSED on the merits, the plaintiff not having established its standing to bring suit as an Indian tribe.

So Ordered.

## MEMORANDUM AND ORDERS ON VARIOUS MOTIONS

### 1. *Plaintiff's Motion for Entry of Findings*

The entry of findings requested by the plaintiff are inappropriate in view of the jury's answers to special interrogatories. Moreover, the subject of land title was reserved as a matter of law rather than of fact, given the undisputed documentary evidence and the jury's answers. Insofar as presently material, my conclusions of law are embodied in the accompanying memorandum on the defendants' motion for judgment. Plaintiff's motion is accordingly DENIED.

### 2. *Defendants' Motion for a Directed Verdict—the White Settlement Exception*

 I am of the opinion that the so-called white settlement exception does not apply to alienation of tribal land, for the reason stated in *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798, 808–809 (D.R.I.1976), and also for the reason that the underlying policies of the act insofar as it relates to land, i. e., (1) to keep peace with the Indians, and (2) to prevent the Indians from becoming homeless charges, would apply with equal force to tribes surrounded by white settlements as to any other tribes.

It should be noted for purposes of this motion, that the evidence is undisputed that by the early eighteenth century the communities surrounding Mashpee had been substantially settled by non-Indians and had been incorporated as the towns of Falmouth, Sandwich and Barnstable.

In view of my reading of the statute, however, defendants' motion for a directed verdict is DENIED.

7. The standards of that Act, at least as I have interpreted it, require that a tribe demonstrate a definable organization before it can qualify for the extraordinary remedy of the total voiding of land titles acquired in good faith and without fraud. Nothing herein, or in the answers of the jury, should be taken as holding or implying that the Mashpee Indians are not a tribe for other purposes, including participation in other federal or state programs, concerning which I express no opinion.