**MASHPEE TRIBE, et al., Plaintiffs,**

v.

**James G. WATT, et al., Defendants.**

**Civ. A. No. 81–3205–S.**

United States District Court,
D. Massachusetts.

June 30, 1982.

Robert C. Hahn, Hahn & Matkov, Boston, Mass., for plaintiffs.

Thomas R. Kiley, Paul A. Matthews, Howard Palmer, Asst. Attys. Gen., Boston, Mass., for Comm./Mass.

James D. St. Clair, Hale & Dorr, Boston, Mass., for Town of Mashpee.

David W. Pyne, Hyannis, Mass., for defendants Bowes and Weekes.

Charles E. Dow, Boston, Mass., for defendant Nye.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

Plaintiffs, on their own behalf and on behalf of the Mashpee tribe, bring this action to recover tribal lands allegedly conveyed by their ancestors in violation of the Constitution and federal statutes.[1] They allege that the United States Government, in failing to approve or prevent the conveyances, violated its trust responsibility to the Mashpee Indians, thereby depriving the plaintiffs of their property and the equal protection of the laws in violation of the Fifth Amendment. Plaintiffs also allege that the Commonwealth of Massachusetts, by authorizing the sales,[2] as well as the Town of Mashpee and certain county and local officials, by validating the sales, violated their rights under the Constitution, the Indian Nonintercourse Act, 25 U.S.C. § 177 ("Nonintercourse Act"), and several other federal statutes. They seek declaratory and injunctive relief and damages.

Defendants Town of Mashpee, William C. Nye, John J. Bowes and Stephen Weekes, and the Commonwealth of Massachusetts have moved to dismiss plaintiffs' complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons which follow, defendants' motions are allowed.

### 1. *Res Judicata.*

Defendants' first ground for dismissal is that plaintiffs' claims are barred by the judgment in *Mashpee Tribe v. Town of Mashpee*, 447 F.Supp. 940 (D.MA.1978), aff'd sub nom., *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979) ("*Mashpee I*"). That suit was brought by the "Mashpee Tribe" of Indians against the owners of allegedly tribal land located in the Town of Mashpee. The alleged tribe sought recovery of that land on the ground that it had been purchased in violation of the Nonintercourse Act. *Id.* at 943. The only question reached was whether the plaintiff constituted a tribe entitled to the protections of the Act. *Id.* After 40 days of trial, the jury found that plaintiff was not such a tribe. *Id.* Accordingly, the case was purportedly "dismissed on the merits", because the plaintiff had "not ... established its standing to bring suit as an Indian tribe". *Id.* at 950. After the jury returned its verdict, the plaintiff was given an opportunity to amend its complaint to state the claims of its individual members, but it chose not to do so. *Mashpee I*, Transcript, pp. 2–3 (January 26, 1978).

The instant suit is substantially the same as *Mashpee I*. The plaintiffs allege that they are members of the Mashpee Tribe, the same entity involved in *Mashpee I*. Many, but not all, of the individual plaintiffs here took an active role in *Mashpee I*, helping to plan the strategy of the case and testifying at trial or in depositions. Some of the defendants named in this case are different from those in *Mashpee I*, but the same land is at issue and the same transactions are challenged. In addition, the same general relief is sought; return of the land to the plaintiffs. Defendants maintain that these similarities require that the instant case be barred by *res judicata*.

---

1. For a detailed discussion of the history of these transactions, *see, Mashpee Tribe v. Town of Mashpee*, 447 F.Supp. 940, 943–947 (D.MA. 1978).

2. Allegedly by the passage of two statutes: (1) ch. 463, Acts of 1869, and (2) ch. 293, Acts of 1870.

## A. Tribal claims.

■ Plaintiffs' claims on behalf of the "Mashpee Tribe" are clearly barred by the decision in *Mashpee I.* Plaintiff there was given a full and fair opportunity to litigate the issue of tribal existence and it was an issue necessary to the outcome of the action. Since the jury held that the "Mashpee Tribe" did not exist at the relevant times, plaintiffs here are collaterally estopped from proceeding on behalf of the alleged tribe. *See, Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n.5, 99 S.Ct. 645, 649 n.5, 58 L.Ed.2d 552 (1979).

## B. Individual claims.

Defendants also contend that plaintiffs' individual claims are barred. They maintain that *Mashpee I* was dismissed on the merits; that plaintiffs here were in privity with the plaintiff in *Mashpee I*; and that therefore plaintiffs are precluded "from relitigating issues that were or could have been raised in that action", *Federated Department Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981), including any individual claims.

Plaintiffs respond by arguing that *Mashpee I* was not a final judgment on the merits because the only issue addressed was that of standing. Since the jury found that no tribe existed, the alleged tribe had no standing to sue, and the court had no jurisdiction to reach the merits. As a result, plaintiffs contend that *Mashpee I* is no bar to the instant suit.

■ In order to analyze the standing question, the identity of the "tribe" recognized by and suing on behalf of its individual members in *Mashpee I* has to be separated from the issue of whether that group constituted a "tribe" entitled to the protections of the Nonintercourse Act. The issue of standing focuses on the characteristics of the party bringing the suit and not upon the issues raised in the complaint. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Whether a plaintiff has a legal interest entitled to protection goes to the merits, not to the question of standing. *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1969).

■ In this case, the group which brought *Mashpee I* possessed the necessary characteristics to establish its standing to sue. It had "Article III" standing because: (1) the group "suffered some actual ... injury" (loss of land); (2) "as a result of the putatively illegal conduct of the defendant[s]" (authorization and consummation of land purchases without federal permission); and (3) the injury is "redressable by the court" (divestiture of the land or similar relief). *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, ——, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The alleged tribe also fell within the court-imposed "prudential" limits on standing because: (1) it was "assert[ing] [its] own legal rights" (to the "tribal" land); (2) it was not asking the court to adjudge "abstract questions of wide public significance" or "generalized grievances"; and (3) its complaint fell within "the zone of interests to be protected ... by the statute ... in question" (the Nonintercourse Act). *Id.* —— U.S. at ——, 102 S.Ct. at 759.

Because the plaintiff in *Mashpee I* had standing, and no other jurisdictional barriers were raised, the court was empowered to determine the merits of the claim. It was at this point that the issue of tribal status under the Nonintercourse Act arose. Since the jury found that the plaintiff was not a "tribe" under the Act, the case was dismissed.

■ Under Fed.R.Civ.P. 41(b), that dismissal operated "as an adjudication on the merits" unless it was "for lack of jurisdiction". "Lack of jurisdiction" within the meaning of the rule covers "plaintiff's failure to comply with a precondition requisite to the Court's going forward to determine the merits of his substantive claim" *Costello v. United States,* 365 U.S. 265, 285, 81 S.Ct. 534, 544, 5 L.Ed.2d 551 (1961). These are technical preconditions to access to the court, not elements of the substantive

claim, and are typically curable. *See, e.g., Costello, supra, Eaton v. Weaver,* 582 F.2d 1250, 1256 (10th Cir. 1978); *Truvillion v. King's Daughters Hospital,* 614 F.2d 520, 525 (5th Cir., 1980); *Smith v. Pittsburgh Gage and Supply Co.,* 464 F.2d 870 (3rd Cir., 1972).

■ *Mashpee I* was clearly not a case in that category and does not fall within the exception to the adjudication on the merits in Rule 41(b). Accordingly, I conclude that the judgment of dismissal in *Mashpee I* was a judgment on the merits. *Cf. Weston Funding Corporation v. Lafayette Towers, Inc.,* 550 F.2d 710 (2nd Cir., 1977).

■ The issue is whether the individual members of the Mashpee Tribe are now barred from bringing a suit in their own behalf. Where the plaintiff in a second suit was in privity with or in control of the plaintiff in the first suit, *res judicata* bars either one from relitigating all issues that were or could have been raised in the initial action. *See, generally,* 1B Moore's ¶ 0.411[1] at 1251–1254, *Federated Dept. Stores,* 452 U.S. at 398, 101 S.Ct. at 2427.

■ Under generalized notions of privity, plaintiffs could be bound on the theory that even though the Mashpee Tribe was not recognized under the Nonintercourse Act, it was an organization which effectively represented the interests of its individual members. *See, Lawlor v. National Screen Service,* 349 U.S. 322, 329 n.19, 75 S.Ct. 865, 869 n.19, 99 L.Ed. 1122 (1955) (privies are "those whose interests are represented by a party to the action"), *General Foods v. Mass. Dept. of Public Health,* 648 F.2d 784, 787 (1st Cir., 1981) ("a person who is not a party to an action but who expressly or impliedly gives a party authority to represent him may be bound by the rule of *res judicata* as though he were a party"), *Acree v. Airline Pilots Association,* 390 F.2d 199, 202–203 (5th Cir., 1968), *cert. denied,* 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1976) (class action by airlines pilots is barred where their individual claims were effectively raised in an earlier suit by their union). It is not clear, however, that the plaintiff in *Mashpee,* in the sense of those individuals who controlled the prosecution of the case, represented all of the plaintiffs here.

Furthermore, even if the technical requirements of *res judicata* have been met, its application may be stayed for competing reasons of public policy or fairness. *See,* 1B Moore's ¶ 0.405[11]–[12] at 783–791. In *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the Supreme Court noted that:

Because *res judicata* may govern grounds and defenses not previously litigated, however, it blockades unexplored paths that may lead to truth. For the sake of repose, *res judicata* shields the fraud and the cheat as well as the honest person. It is therefore invoked only after careful inquiry.

*Brown v. Felsen,* 442 U.S. at 132, 99 S.Ct. at 2209. And, in *Blonder-Tongue v. University Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Court noted that:

Both orderliness and reasonable time saving ... require that [res judicata be applied] unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case.

*Blonder-Tongue,* 402 U.S. 324–325, 91 S.Ct. at 1440.

Considerations of public policy and fairness have led courts to stay the application of *res judicata* in a number of different situations, e.g., (1) where "neither the interests served by *res judicata,* the process of orderly adjudication in state courts, nor the policies of the Bankruptcy Act would be well served" by precluding the petitioner from presenting evidence beyond the earlier judgment in a later suit to determine whether a debt previously reduced to judgment is dischargeable under the Act, *Brown,* 442 U.S. at 133, 99 S.Ct. at 2210; (2) where the public's interest in giving close scrutiny to fee arrangements between attorney and client outweighs the policies behind *res judicata* and collateral estoppel, *Spilker v. Hankin,* 188 F.2d 35 (D.C.Cir., 1951); (3) where the public policy against

monopolization prevents a patentee from conclusively establishing the validity of a patent for the purpose of obtaining injunctive relief, *Lawlor*, 349 U.S. at 326–329, 75 S.Ct. at 867–869; (4) where giving strict *res judicata* effect to state administrative decisions would undermine considerations of federal preemption, *Town of · Springfield, Vt. v. State*, 521 F.Supp. 243, 246 (D.Vt., 1981); and (5) where application of *res judicata* would enable employers to immunize themselves against enforcement of OSHA standards, a result contrary to the policies of the Act, *International Harvester Co. v. Occupational Safety and Health Review Commission*, 628 F.2d 982, 986 (7th Cir., 1980).

■ This action involves the rights of American Indians, a subject of special concern to the federal government. As one court has recently noted:

> It is federal policy, undeniable, if belated, that the Indian has a special status in our Country and that he is justly entitled to very special protection.

*Red Fox v. Red Fox*, 564 F.2d 361, 365 (9th Cir., 1977), *quoting, Aqua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184, 1188 (9th Cir., 1971) (Ely, J., dissenting), *cert. denied*, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). That special concern may provide the basis for staying the effect of *res judicata* in particular cases. *See, id.*

The instant suit also presents, for the first time, the claims of the individual descendants of the Mashpee Tribe. It raises an issue under the Nonintercourse Act

which has not been fully addressed by any court, an issue which will also be raised in several related cases now pending before me.[3]

Because the case involves the rights of American Indians and raises unresolved issues with regard to those rights, the strict application of *res judicata* to bar plaintiffs' individual claims should not be applied as a matter of public policy even though it might be otherwise applicable.[4] Accordingly, while plaintiffs' tribal claims are barred for the reasons stated previously, I will consider the legal merits of plaintiffs' individual claims.

### 2. Plaintiffs' Individual Claims.

#### A. Nonintercourse Act.

Plaintiffs allege that the state and local defendants violated the Nonintercourse Act, 25 U.S.C. § 177, by authorizing the sale of their ancestral land without federal approval.[5] They maintain that even though they do not constitute a tribe under the Act, nor were they such a tribe at the time the challenged conveyances were made, *see, Mashpee I*, they are still entitled to the protections of the Act because of their status as individual Indians. Defendants contend that only sales of tribally held land, not land owned by individual Indians, are covered by the Act and that therefore only tribes can state a cause of action under its provisions.

Several cases have stated that while land transactions by individual Indians were subject to the restrictions of the Noninter-

---

3. *Christiantown Tribe, et al v. Watt, et al,* Civ.No. 81–3206–S; *Chappaquidick Tribe, et al v. Watt, et al,* Civ.No. 81–3207–S; *Herring Pond Tribe, et al v. Watt, et al,* Civ.No. 81–3208–S; *Troy Tribe, et al v. Watt, et al,* Civ.No. 81-3209–S.

4. I am aware that the Supreme Court, in a recent case, *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 403, 101 S.Ct. 2424, 2429, 2430, 69 L.Ed.2d 103 (1981) has cast a pall upon the "flexible" application of *res judicata.* I do not think that that case requires a different result here, however. First, the court did not expressly overrule other recent cases such as *Brown,* 442 U.S. 127, 99 S.Ct. 2205, 60

L.Ed.2d 767 (1979), which had reaffirmed the flexibility of *res judicata* in certain cases. Second, *Federated Dept. Stores* involved the *res judicata* effect of a failure to appeal, a circumstance more directly implicating the public policy in favor of repose.

5. The Nonintercourse Act provides:

No purchase, grant, lease or other conveyance of lands, . . . , from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177.

course Act in its early versions,[6] that coverage was eliminated with the passage of the 1834 Act.[7] *See, Epps v. Andrus,* 611 F.2d 915, 917 (1st Cir., 1979), *Narragansett Tribe v. Southern Rhode Island Land Dev. Corp.,* 418 F.Supp. 798, 808–809 (D.R.I., 1976), *Mohegan Tribe v. State of Connecticut,* 638 F.2d 612, 627 (2nd Cir., 1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981), *see, generally,* Dwyer, *Land Claims Under the Indian Nonintercourse Act: 25 U.S.C. § 177,* 7 B.C.Env.Affs.L.Rev. 259, 271 (1979). Accordingly, it has been held that individual Indians may not state a claim under the Nonintercourse Act. *See, Epps,* 611 F.2d at 917–918.

These cases, however, did not consider the effect of § 29 of the 1834 Act on the continued existence of whatever individual rights there were under the previous Nonintercourse Act. Section 29 was a "saving clause". "[T]he Nonintercourse statute contained in the 1802 Act remained applicable by virtue of § 29 of the 1834 Act to the tribes east of the Mississippi." *Mohegan,* 638 F.2d at 626; *see also,* Note, *Land Claims Under the Indian Trade and Intercourse Acts: The White Settlement Exception Defense,* 60 B.U.L.Rev. 911 (1980). *Mohegan* held that § 29 continued the applicability of the "white settlements exception" of the 1802 Act to the eastern tribes, even after its elimination in the 1834 Act. 638 F.2d at 626–628. Plaintiffs argue that § 29 also preserved the language "from any Indian" in the 1834 Act and thereby established the basis for their cause of action.

Defendants assert to the contrary that the language of section 29, that the repeal of the 1802 Act by the 1834 Act "shall not . . . impair or affect the intercourse act of

eighteen hundred and two, so far as the same relates to or concerns Indian tribes residing east of the Mississippi . . .", saves only tribal rights. The language may also be read, however, to mean that with respect to tribes east of the Mississippi, the rights of individual Indians would be preserved. This ambiguity requires me to explore the intent of Congress, never clear at best, now shrouded by a "veil of time" nearly two centuries thick.

The major purpose of the Nonintercourse Act was to prevent Indian uprisings and preserve the peace along the frontier. *Mohegan,* 638 F.2d at 621. This was to be accomplished two ways. One was by "protect[ing] the rights of Indians to their properties", *Wilson v. Omaha Indian Tribes,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), by acknowledging and guaranteeing the Indian tribes' right to occupy their aboriginal lands ("aboriginal title"). *See, Narragansett,* 418 F.Supp. at 803. The other was by preventing the Indians from "improvidently disposing of their lands" at fraudulently low prices. *Id., see generally,* Note, *supra,* 60 B.U.L.Rev. at 918–919. This purpose would in no way be served by restricting the alienation of property acquired by Indians from non-Indians in settled sections of the country. It seems clear, therefore, that the Nonintercourse Acts imposed restrictions only on the alienation of land held under aboriginal title.

Aboriginal title, however, was always tribal, and held in common by the members of the tribe. Individual use and occupancy might be granted by consent, and indeed might be extended to one family

---

**6.** The first of the Nonintercourse Acts was enacted in 1790, Act of July 22, 1790, ch. 33, 1 Stat. 137 ("1790 Act"). Section 4 provided that: "no sale of lands made by any *Indians,* or any nation or tribe of Indians, shall be valid . . ., unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." (emphasis added). That provision was reenacted in 1793, Act of March 1, 1793, ch. 19, 1 Stat. 329; 1796, Act of May 19, 1796, ch. 30, 1 Stat. 469; 1799, Act of March 3, 1799, ch. 46, 1 Stat. 743; and in 1802, Act of March 30, 1802, ch. 13, 2 Stat.

139 ("the 1802 Act"). Section 12 of the 1802 Act stated that: "no purchase, grant, lease, or other conveyance of lands, . . ., from any *Indian,* or nation, or tribe of Indians" without federal approval was invalid. (emphasis added).

**7.** In section 12 of the Act of June 30, 1834, ch. 161, 4 Stat. 729 ("the 1834 Act"), the reference to "any Indian" in the 1802 Act was eliminated, and the restriction on alienation of Indian land was enacted in substantially the form of 25 U.S.C. § 177.

or network of families from generation to generation, but such right of use and occupancy was not transferable, and title at all times remained in the tribe. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 665, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979); *Joint Tribal Council of Passamaquoddy Tribes v. Morton*, 528 F.2d 370, 376 n.6 (1st Cir., 1975). As one recent commentator observed:

> Although the Act makes reference to individual Indians, the justification for allowing only Indian tribes to assert claims under the Act is warranted. This justification rests on the nature of the relationship between an individual Indian and his rights to tribal land. Indian land belonged to the tribe as a community and the right of each individual to participate in the enjoyment of such property depended on tribal membership. This right was neither alienable nor descendible, and it did not entitle an individual to a pro rata proportion of the proceeds of any sales of the land made by the tribe. Thus the fact that no individual Indian can assert a cause of action under the Act is consistent with his rights to tribal land.

Comments, *Indian Land Claims under the Nonintercourse Act*, 44 Albany L.Rev. 110, 122 (1979).

The above description was in fact applicable to the Mashpee Indian community until 1842. *Mashpee I*, 447 F.Supp. at 946; Hutchins, *Mashpee, The Story of Cape Cod's Indian Town*, Amarta Press, 1979, pp. 118–119. In 1842, the General Court of Massachusetts granted to the Indian Proprietors of Mashpee a limited title to up to 60 acres of previously allotted common land of the proprietorship. This title was in all respects the equivalent of fee simple title except that the land could not be alienated to anyone except another Mashpee proprietor. *Id.* In 1869, the General Court released this restriction on alienation. By this time, some of the proprietors had sold their property to other proprietors, some of whom had acquired very large tracts of land.

Thus some Mashpee Indians did acquire individual title to land which had been held in aboriginal Indian title. Did Congress intend such land to be covered by the Nonintercourse Act of 1802?

Congress did in fact go through the same allotment process with other Indian tribes as the General Court of Massachusetts had with Mashpee, and in many of these cases had restricted the rights of individual Indians to alienate these holdings without the approval of the federal government. Such approval was provided for by administrative action, however, and not by "treaty or convention" approved by Congress, and the restriction was limited in time to 21 or 25 years. Cohen, *Handbook of Federal Indian Law*, U.S. Government Printing Office, 1943, pp. 108–109, 206, 221–227.

While it thus appears that restriction of alienation on individual Indian lands for various periods of time was a policy of Congress as expressed in divers acts and treaties affecting Indian tribes, it does not follow that such an intent was expressed in the Nonintercourse Act for the following reasons:

First, the language "any Indians, or nation or tribe of Indians" was carried over into the 1802 Act through a succession of intervening statutes, from the first Nonintercourse Act, which was enacted July 22, 1790, 1 Stat. 137. It is unlikely that Congress was contemplating the sale of individual Indian allotments at this time. In 1790, the President and Congress were concerned with peace on the frontier and preventing the nation's relationship with large and powerful Indian tribes from dangerous deterioration as a result of the depredations of unscrupulous non-Indian settlers. It is not likely that they were troubled by rare sales of land held by individual Indians.[8]

Second, the scheme of regulations of allotted lands was tailored to deal-

8. For a general discussion of the purposes of the Act, *see*, F. Prucha, American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts 1790–1834 (1962).

ings with individuals; e.g., permission to sell or mortgage was granted administratively; the restraint was limited in time and could be lifted if the Indian administrator was satisfied that the individual owner was capable of handling his own affairs. Cohen, *supra*, 109. Under the Nonintercourse Acts, the restraint on alienation could be released only by treaty or convention. Treaties and conventions are made by the President with the consent of the Senate. The terms are ordinarily applied to arrangement between sovereign powers, including Indian tribes. *See, Edye v. Robertson*, 112 U.S. 580, 598, 5 S.Ct. 247, 253, 28 L.Ed. 798 (1884); *United States v. Wheeler*, 435 U.S. 313, 322–323, 98 S.Ct. 1079, 1085–1086, 55 L.Ed.2d 303 (1978). It seems highly unlikely that Congress intended to crank up the whole cumbersome treaty power of the United States every time an individual Indian undertook to mortgage or sell his section of allotted land. "Treaty or convention" is wholly inappropriate language to describe a nation's dealing with an individual.

What, then, is the meaning of "any Indian" in the phrase "any Indian, or nation, or tribe of Indians"? One commentator has suggested that "any Indian" was included to cover the common situation where rights to tribal land were granted by deed of a chief or of head men as representatives of the tribe. Note, *supra*, 60 B.U.L.Rev. 928. Such deeds figure prominently in Mashpee history, e.g., the grants by Paupmunnuck to Myles Standish and of Weepquish, Tookonchasun, and later Quachatasset to the Mashpee proprietors. Hutchins, *supra*, pp. 26, 47–51. This reading also provides an explanation for the dropping of the phrase without debate or comment in the 1834 Act: it was redundant.

It is noteworthy, although not conclusive, that even the 1802 Act did not include the phrase "any Indian" in that part of section 12 which provided punishment for negotiating the sale of Indian lands:

> ...: and it shall be a misdemeanor in any person, not employed under the authority of the United States, to negotiate such treaty or convention, directly or indirectly, to treat with *any such Indian nation, or tribe of Indians*, for the title or purchase of any lands by them held or claimed, punishable by fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months: .... (emphasis supplied)

If the savings clause was not for the purpose of preserving a restriction on the alienation of individual Indian title, what was its function? In *Mohegan, supra*, the Court of Appeals for the Second Circuit held that it preserved the "white settlement" exception with respect to eastern Indians. Since the trading provisions of the 1834 Nonintercourse Act applied only to "Indian Country",[9] however, the need to preserve that exception is far from clear. The most satisfactory explanation is that opponents of the administration's Indian policy, led by Senator Freylinghuysen of New Jersey, were concerned that the emphasis in the 1834 Act on "Indian Country", and the federal policy of forced relocation westward of the Indians, would leave tribes and remnants of tribes east of the Mississippi without federal protection.[10] *See*, Sen. Freylinghuysen, *Speech Delivered in the Senate of the United States*, Gales & Seaton's Register of Debates in Congress, Vol. 6, 21st Cong., 1st Sess., Friday, April 9,

---

**9.** Section 1 of the 1834 Act defined "Indian Country" as

> all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished.

This definition has been interpreted to include any land, not within the borders of a state east

of the Mississippi and to which Indian title has not been extinguished. *See, Bates v. Clark*, 95 U.S. 204, 207–208, 24 L.Ed. 471 (1877), *Mohegan*, 638 F.2d at 618.

**10.** This interpretation of section 29 does not require, and I do not hold, that the provisions of the 1834 Act, in fact, only applied in "Indian Country". *Compare, Mohegan*, 638 F.2d at 626, and *Mohegan*, 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981, Rehnquist, J. (dissenting).

1830, pp. 309–322. Section 29 of the 1834 act, "the saving clause", was added to the Act by an amendment offered by Senator Freylinghuysen. *See,* H.R.Rep.No.474, 23rd Cong., 1st Sess. 83; Congressional Debates, Vol. 10, part 4, 23rd Cong. (1833–1834) at 2125.

■■■ Accordingly, I conclude that section 29 of the Nonintercourse Act of 1834 did not preserve any federal restriction on the alienation of land held by individual Indians because no such restriction existed in the 1802 Act.

I realize that dicta in *Epps v. Andrus, supra,* 611 F.2d at 917, *Narragansett Tribe, supra,* 418 F.Supp. 808–809 and, in my own opinion, in *Mashpee I,* 447 F.Supp. at 950, suggest that there was such a federal restriction. This conclusion was not necessary to the result in any of those cases, and at least in *Mashpee I,* the issue was not explored. In my opinion, these dicta are incorrect.

■■■ The ultimate conclusion in *Epps v. Andrus,* however, that only Indian tribes or nations of Indians may invoke the protection of the Nonintercourse Act is correct for the reasons stated above. The issue of tribal status having been resolved against the plaintiffs in *Mashpee I,* their claims as individuals under the Nonintercourse Acts must be dismissed.

B. *Other Claims.*

In addition to their claims under the Nonintercourse Act, plaintiffs allege violations of several constitutional and statutory provisions:

■■■ (1) Plaintiffs allege that the Commonwealth's and the town's actions in authorizing the sale of their ancestral lands violated the Commerce Clause, U. S. Constitution, Article I, § 8, cl. 3. The Commerce Clause provides that Congress shall have the power to "regulate commerce . . . with the Indian Tribes". *Id.* It has been held to

apply two limitations on the states' authority to regulate Indian affairs. One is federal preemption. *See, McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). Since there is no federal statute which protects plaintiffs here, preemption is not applicable. The other limitation is based on inherent Indian sovereignty. *See, id.;* Laurence, *The Indian Commerce Clause,* 23 Ariz.L.Rev. 203, 242 (1981). To the extent this limitation is available, however, it applies to state interference with tribal self-government. *Id.* Since plaintiffs do not constitute a tribe, it too is inapplicable.

■■■ (2) Plaintiffs also allege that the state defendants' actions violated the Supremacy Clause, U. S. Constitution, Article VI, cl. 2. The Supremacy Clause does not support direct causes of action, however. It only gives priority to federal rights created by a federal statute when they conflict with state law. *See, Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 613, 99 S.Ct. 1905, 1913, 60 L.Ed.2d 508 (1979). Since plaintiffs have not shown the acts of the state to be in conflict with any federal laws affecting them as individuals, the Supremacy Clause does not apply.

(3) Plaintiffs allege that all the defendants violated their rights under the due process and equal protection guarantees of the Constitution by failing to accord them their rights secured by the Nonintercourse Act. Since I have already held that they are not protected by the Act, these claims must fall as well.

■■■ (4) A similar result is reached for plaintiffs' claims under 42 U.S.C. § 1983, 25 U.S.C. § 1322(b), and 28 U.S.C. § 1360(b).[11] Since plaintiffs have shown no violation of federal law and no trust relationship or other restriction upon the alienation of the claimed land, they have no cause of action under these statutes.

11. Sections 25 U.S.C. § 1322(b) and 28 U.S.C. § 1360(b) both provide that:
   Nothing in this section shall authorize the alienation . . . of any real . . . property . . .

belonging to any Indian . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States . . .

**(5)** Nor have plaintiffs stated claims under the National Environmental Policy Act, 42 U.S.C. §§ 4331–4335, or the laws governing the conservation of historic sites and archeological resources, 16 U.S.C. §§ 461–470n, 470aa–470*ll*. These statutes do not provide for any causes of action applicable to the actions challenged by plaintiffs.

Since plaintiffs have failed to state any claim upon which relief may be granted, defendants' motions must be ALLOWED as to all counts. Accordingly, plaintiffs' complaint is DISMISSED with respect to defendants Town of Mashpee, William C. Nye, John J. Bowes, Stephen Weekes, and the Commonwealth of Massachusetts.